[Civ. No. 26565. Second Dist., Div. Two. Mar. 22, 1963.]

LORAMAE H. MAGEE et al., Plaintiffs and Appellants, v. WYETH LABORATORIES, INC., Defendant and Respondent.

Austin, Austin, Jones & Chaffee and Richard M. Hawkins for Plaintiffs and Appellants.

Spray, Gould & Bowers and Joseph L. Spray for Defendant and Respondent.

ASHBURN, J.—Plaintiffs, the widow and children of Tarance S. Magee, deceased, appeal from an adverse judgment in an action for damages for wrongful death caused by administration of Sparine, a Promazine drug, with resulting Agranulocytosis and death.

Originally, Las Encinas Sanitarium, Wyeth Laboratories, Inc., and seven physicians and nine nurses were named as defendants but a settlement was reached before trial between plaintiffs and all defendants other than Wyeth Laboratories, Inc., whereby plaintiffs received the sum of $23,500 in exchange for a covenant not to sue further and the action was dismissed as to all of said defendants other than Wyeth. The cause proceeded to trial against Wyeth and a jury unanimously rendered a verdict in its favor.

Appellants assign as grounds for reversal the following: (1) Refusal to instruct the jury on breach of warranty, (2) erroneous admission into evidence of the final paragraph of a report of the Council on Drugs of the American Medical Association, (3) exclusion of report of Committee on Judiciary of United States Senate, (4) receiving over objection certain testimony of Dr. Keith Ditman, (5) misconduct of defense counsel in advising the jury that a settlement for $23,500 had been made with some defendants.

There is no substantial conflict in the evidence, which is presented through an engrossed settled statement. Mr. Magee, a practicing attorney, who was suffering from an emotional depression, entered Las Encinas Sanitarium on October 7, 1958. Between that date and November 17, 1958, when

he died, he was administered the drug Sparine which was manufactured and sold by defendant Wyeth. On or about November 13, 1958, Mr. Magee contracted Agranulocytosis, a blood disorder wherein certain white corpuscles called granulocytes are greatly reduced or completely eliminated. The statement says: "The absence of these granulocytes deprive the human body of its mechanism in fighting infection and, thereafter, deceased became infected over most of his body which resulted in his death."

## I.

Dr. Dennis S. Shillam, who performed an autopsy and was the only doctor called by plaintiffs, said that Mr. Magee died of Agranulocytosis caused by the drug Sparine; also, "that presumably the Agranulocytosis was the result of drug sensitivity but he had some doubts in his mind." In the hospital records of the sanitarium he had recorded a diagnosis, reading in part, "due to drug sensitivity?" The statement says: "Plaintiffs' counsel offered no medical testimony that in any way criticized Sparine or the literature that accompanied the drug, or promazine drugs in general."

Sparine is a prescription drug, to be used only pursuant to prescription of a physician. There is nothing in the record to suggest that decedent purchased the drug himself or that it was administered in any manner other than injection by or under direction of the attending physician. Pamphlets and other literature on Sparine, such as a direction circular (exhibit 5) and a booklet entitled "Current Clinical Reports on Sparine from the Literature" (exhibit 10) were furnished to the medical profession, for that is the group for whose use Sparine primarily is intended, and those documents were furnished to the Las Encinas group.

Dr. Herbert A. Duncan, one of the original defendants, called as a witness for plaintiffs, is a psychiatrist who has been employed by Las Encinas since 1946. He testified that Sparine and other Promazine drugs are widely used by psychiatrists in treatment of nervous diseases; that he and other doctors at Las Encinas used it extensively before and after the Magee illness. "He testified that he read the direction sheet and literature left by Wyeth Laboratories, Inc. representatives prior to Mr. Magee's death, and knew, prior to Mr. Magee's death, that rare individuals might be sensitive to Sparine and other promazine drugs; that death might result in such rare individuals. Dr. Duncan, in no way, criticized Sparine or the literature that accompanied it and testified that

he is still using the drug; that, in his opinion, it is a safe drug. Other than Mr. Magee's case, there were no other adverse reactions associated with the drug at the Las Encinas Sanitarium.

Dr. Keith Ditman, a well-qualified psychiatrist, a Diplomate of the American Board of Neurology and Psychiatry, "testified that he has used Sparine and promazine drugs since they were put on the market in 1956 and that he has used these drugs in hundreds of cases; that the Council on Drugs of the American Medical Association, on occasion, solicit his opinion as to particular drugs. He testified that in his opinion, Sparine is a safe and adequate drug; that, in fact, Sparine is safer than most similar drugs in that it has fewer side effects, and in other particulars." Also, "he testified that promazine drugs had been a greater revolution to medicine than antibiotics; that thousands and thousands of mental patients have been restored to normal life through the use of Sparine and similar promazine drugs. He testified that medical knowledge is such at the present time that it is impossible to manufacture drugs that rare individuals will not be sensitive to; that all drugs have side effects with rare individuals, including aspirin and penicillin; that approximately 200 people a year die from sensitivity to penicillin; that Sparine is a far safer drug than penicillin. He testified that Agranulocytosis is a very serious complication and if a patient develops the condition he must have immediate attention or he will not survive."

Returning now to the testimony of Dr. Duncan. He had read the direction circular (exhibit 5) and other literature which was furnished periodically by Wyeth and "knew, prior to Mr. Magee's death, that rare individuals might be sensitive to Sparine and other promazine drugs; that death might result in such rare individuals." Also was familiar with the following portion of the document: "Agranulocytosis has occurred in 18 instances from some 3½ million patients who have received the drug. Patients should be observed frequently and asked to report immediately any sudden appearance of any signs of infection, if white blood cell counts and differential smears give an indication of severe cellular depression the drug should be discontinued and antibiotic and other suitable therapy should be initiated." He also testified, "that Tarence Magee entered the Sanitarium on October 7, 1958 and received Sparine in heavy doses from about this time until November 14 or November 15. He developed a temperature and sore throat on November 14 or 15, 1958;

that this condition became progressively worse. No white cell blood count was ever done until November 15th or 16th. That the white cell count was reported critically low; that no specialist was called on the case until November 17, 1958, when Dr. Edward R. Evans, a specialist in internal medicine, was called in and determined that Tarence Magee was acutely ill with Agranulocytosis; that this diagnosis was not made until November 17, 1958. There was no testimony that Mr. Magee had been instructed to report any of the signs of Agranulocytosis, as suggested by the Direction Circular. The matters set forth in the above paragraph also appeared in the hospital records of the Las Encinas Sanitarium.''

The question of whether plaintiffs' requested instruction should have been given is the important one in the case. No warranty instruction was requested until after the evidence had been concluded (see, Code Civ. Proc., § 607a) ; the judge indicated that plaintiffs' requests on warranty were erroneous but said he would give further consideration to same if revised. Counsel argued both negligence and warranty. No revised instruction was submitted until after the judge had begun to deliver his instructions. The statement says that no instruction on warranty was given and the only such request before the court seems to have been number 11, for that is the only one in our record.[1]

We are not confronted with any problem of privity of contract for that element is no longer necessary to a warranty of food or drugs. (See *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57, 61, 63 [27 Cal.Rptr. 697, 377

---

[1] ''Instruction No. *11*. If upon all of the evidence in this case and all of the instructions of the Court, you find that the defendant Wyeth Laboratories, Inc., a corporation, manufactured and sold a drug called 'Sparine' on the open market which it knew was intended for consumption by human beings, and that the purpose of said drug was to tranquilize or calm decedent, and if you further find that Tarence S. Magee, decedent, did actually or by implication make known to defendant the purpose for which said drug was to be used, and directly or impliedly relied upon the skill and judgment of the defendant in relation thereto, and if you find that said 'Sparine' was in fact consumed by said decedent and said drug was in fact a proximate cause of the death of said decedent, then if you so find, I instruct you as follows:

''1. That there was an implied warranty applicable in this case, and imposed by law on the defendant Wyeth Laboratories, Inc., a corporation, that the aforesaid product, 'Sparine' would be reasonably fit for human consumption.

''2. That the defendant Wyeth Laboratories breached said implied warranty if you so find.

''3. That defendant is liable for said breach of warranty without any proof of fault on the part of defendant, its employees or agents.''

P.2d 897]; *Gottsdanker* v. *Cutter Laboratories,* 182 Cal.App.
2d 602, 607 [6 Cal.Rptr. 320].)

 Manifestly, this proposed instruction is erroneous; it assumes, without supporting evidence, that decedent "did actually or by implication make known to defendant the purpose for which said drug was to be used, and directly or impliedly relied upon the skill and judgment of the defendant in relation thereto." The inescapable inference is that Mr. Magee did not purchase this drug or rely upon the skill or judgment of anyone other than his physicians and the hospital staff. It was administered intravenously or intramuscularly, and there is no evidence to the effect that decedent knew the identity of the drug given him or whence it came. Appellants' counsel conceded on oral argument that Mr. Magee did not know what medicine he was taking.

The instruction would leave to the jury the question of whether the drug "was in fact a proximate cause of the death of said decedent." As we have no other instructions upon any subject in the record it is to be presumed that the trial judge accurately and fully instructed upon the subject of proximate cause. But there is no showing that the jury had any enlightenment upon the subject of superseding cause in a case of this kind and without such supplemental instruction the one requested by plaintiffs should not have been given. This matter is discussed further *infra.*

The request concludes with the statement that there was an implied warranty that " 'Sparine' would be reasonably fit for human consumption," and leaves it to the jury to determine whether the warranty had been breached. There is no evidence in the record from which it can be inferred that Sparine was not reasonably fit for human consumption or that the injections received by decedent were not up to Sparine standard. Of course, that drug is not fit for babies to swallow and is not for adults to take except under the supervision of a physician. The implied warranty of a drug when sold is that it is fit for the contemplated use by the class of persons for whom it has been prepared and in the manner indicated by the manufacturer. Here, so far as appears, the contemplated use was that of administration to a patient by or under the direction of a physician and by no other persons and in no other manner.

 This record warrants an inference of negligence on the part of Dr. Duncan, who failed to follow directions emanating from the manufacturer, although all of them were known to

him. The propriety of none of them has been questioned by him or by appellants' counsel. The intervention of such negligence of the doctor is not a foreseeable consequence of the sale of the drug within the narrow field in and for which it was distributed. Or, if it be conceded *arguendo* that the question of foreseeability of the doctor's intervening tort was one of fact (cf. *Di Muro* v. *Masterson Trusafe Steel Scaffold Co.,* 193 Cal.App.2d 784, 794 [14 Cal.Rptr. 551]), there certainly is no basis for treating it as one of law such as to warrant the instruction of liability on defendant's part as requested by plaintiffs. See, *Harper* v. *Remington Arms Co.,* 156 Misc. 53 [280 N.Y.S. 862, 866-869]; 248 App.Div. 713 [290 N.Y.S. 130]; 272 N.Y. 675.

In that case defendant manufacturer was exonerated from a charge of breach of warranty with respect to certain shotgun shells which had been manufactured and sold "exclusively for use in the testing of guns, and were possessed of a greater explosive force than ordinary commercial shells." The plaintiff came into possession of them and, being unable to comprehend the warning on the box, loaded his gun with them; upon the first discharge the gun barrel was blown out by the force of the shell and three of his fingers were blown off. There was no proof that the shells were imperfect, negligently manufactured, or that they were not suitable for the purpose for which they were intended, *viz.,* for testing purposes. The court said, in part, at page 866 of 280 New York Supplement: "No act is wrongful unless the probability of injury to some determinate person or class of persons raises the duty as to those persons to refrain from such act. No action can be brought until the probability of injury has culminated in damage actually sustained in consequence of the act. . . . The existence of the duty and the care required to satisfy that duty are to be determined by the reasonable anticipation of the normal man." At page 867: "The orbit of danger extended to protect only those who might reasonably have been anticipated by the normal prudent man to have been within that orbit. To all these persons the defendant owed a duty of due care." At page 868: "In the instant case, the defendant was duty bound to see that the class for whom these shells was intended or into whose hands they might reasonably pass had knowledge of their dangerous character. To those persons the defendant owed the duty of giving notice and warning, and an omission to give it would have been negligence. . . . The plaintiff herein was not within the orbit of danger. The plaintiff failed to

show that he was a person whom the defendant might reasonably have anticipated would use these shells. Neither has the plaintiff shown that the shells were put to a use which the defendant had reason to expect they would be put. . . . The defendant did not contemplate nor expect a resale of the shells even by dealers in shells to anyone except arms manufacturers who were familiar with this type of shell. The defendant did not contemplate and had no reason to contemplate the use of them for anything other than for testing purposes. In selling these shells exclusively to arms manufacturers or dealers in shells, the defendant's liability ceased at the time of yielding the control of these shells to the vendee, provided the vendee was put on or had notice of their dangerous character. *Sagler* v. *Kellogg Steamship Corp.*, *supra* [155 Misc. 217 (277 N.Y.S. 792)]. The plaintiff was not a person to whom the defendant could contemplate these shells would pass, and the defendant owed no duty to any one other than those whom it expected rightfully and properly to use these shells." To the same effect see, *Pedroli* v. *Russell*, 157 Cal.App.2d 281, 284-285 [320 P.2d 873].

 The rule seems settled that a person not reasonably expected to use the manufacturer's drug (or product) is not one to whom the warranty runs, and that he who uses it in a manner contrary to adequate warnings given by the manufacturer is in the same status. In other words, an adequate warning of danger given to those normally expected to use a particular drug absolves the manufacturer from any liability in warranty. *Nishida* v. *E. I. Du Pont De Nemours & Company* (5th Cir. 1957) 245 F.2d 768, 774: "Du Pont acquired knowledge of the dangers of feeding tri-processed soybean meal to cattle and it might be assumed that, prior to the warning letter, Magnolia was without such knowledge or not as aware of the dangers as du Pont was or should have been. Under such circumstances du Pont was under a duty to warn Magnolia of the risks. . . . It follows, of course, that when a warning is given the original manufacturer or supplier, here Du Pont, is not liable. . . ." See, to the same effect, *Stull's Chemicals* v. *Davis* (Tex. Civ.App.) 263 S.W.2d 806; *Carmen* v. *Eli Lilly & Co.*, 109 Ind.App. 76 [32 N.E.2d 729, 732]; Note 76 American Law Reports 2d at page 25.

Such reasonable warning in the case of a drug which is manufactured for use of doctors and distributed primarily to them and for their use may be found in communications intended for and received by them, as in the case at bar. The

said annotation in 76 American Law Reports 2d, at page 25 says: "Assuming that there may be recovery, regardless of lack of privity of contract, on the basis of a manufacturer's negligence in failing to warn his immediate vendee, there can be no recovery on such basis by one other than the immediate vendee where adequate warning was given the immediate vendee." On the same page a pertinent English case, decided by the Court of Appeal, is analyzed as follows: "And the English court in *Holmes* v. *Ashford* [1950] 2 All.Eng. 76 (C.A.), held that the manufacturer of 'Inecto' hair dye was not liable to one injured when the dye had been applied to her hair by a beauty-parlor operator to whom the manufacturer had sold the dye where the manufacturer inclosed with the dye instructions warning users that it might be dangerous to certain skins and advising that a test should be made before use, and, notwithstanding this warning, the beautyshop operator applied the dye to plaintiff's hair without a test. The court said that when the manufacturer gave a warning which, if read by the beauty-parlor operator, was sufficient to intimate to him the potential dangers of the substance with which he was going to deal, 'that is all that can be expected of them,' and it would be 'unreasonable and impossible to expect that they should give warning in such form that it must come to the knowledge of the particular customer who is going to be treated.' " See also, *Foster* v. *Ford Motor Co.*, 139 Wash. 341 [246 P. 945, 48 A.L.R. 934]; *Harper* v. *Remington Arms Co., supra*, 156 Misc. 53 [280 N.Y.S. 862, 867]. ▉ The last cited A.L.R. Annotation further says, at page 27: "Closely related to the principle that there is no duty to warn of dangers which arise only when a product is put to an unforeseeable use is the proposition that a manufacturer or seller has no duty to give warning of product-connected dangers to one who it is not to be expected will use the product."

▉ There are a few cases, such as *Gielski* v. *State* (Court of Claims) 3 Misc.2d 578 [155 N.Y.S.2d 863], which hold that "[t]he fact that the instrumentality was distributed only to members of the medical profession for use by them cannot serve to insulate the manufacturer and distributor from liability to the patient as a matter of law." (P. 868 [155 N.Y.S. 2d].) But the instant case does not fall in the same category for there is present here every element of intervening proximate cause in the conduct of the attending physician. Failure to follow an unchallenged method of use prescribed by the manufacturer constitutes a break in causation which exoner-

ates the manufacturer from any liability. See, *C. Lomori & Son* v. *Globe Laboratories*, 35 Cal.App.2d 248, 256 [95 P.2d 173] ; *Crawford* v. *Marysville Fuel Co.*, 33 Cal.App.2d 73 [90 P.2d 864].

 Reliance upon the alleged warranty is essential to plaintiffs' cause of action (*Pedroli* v. *Russell, supra,* 157 Cal. App.2d 281, 285), and there is no basis for an inference that Mr. Magee had any voluntary part in the selection or use of this drug, no opportunity for reliance upon the warranty and no reliance in fact.

There is evidence from which it may be inferred that Mr. Magee was possessed of a physical idiosyncrasy that made him allergic to Sparine and there is no showing to the contrary. The warranty attending drugs does not run in favor of one who suffers from such allergy unless it is one possessed by a substantial portion of possible users. Nor is there any duty to warn such allergic person concerning any dangers incident to use of the drug because he is not within the class reasonably expected to use it. Arguments concerning warnings to persons situated as was Mr. Magee are beside the point, for there was no sale to him by prescription or otherwise, no invitation to him to use except under a doctor's direction, and no reasonable expectation that he would do so. Prosser on Torts (2d ed.) chapter 17, section 84, page 503 : "The manufacturer is at least entitled to assume that his product will be put to a normal use; and he is not subject to liability where it would ordinarily be safe, but injury results because it is mishandled, or is used in some unusual and unforeseeable way. . . . In the ordinary case the maker may also assume a normal user; and he is not liable where the injury is due to some allergy or other personal idiosyncrasy of the consumer, found only in an insignificant percentage of the population. But if the allergy is one common to any substantial number of possible users, the seller may be required at least to give warning of the danger."[2]

 The manufacturer's duty is "to reasonably guard against probabilities, not possibilities." (*Merrill* v. *Beaute Vues Corp.* (10th Cir. 1956) 235 F.2d 893, 896.) See also *Bish* v. *Employers Liability Assurance Corp.* (5th Cir. 1956) 236 F.2d 62, 68, 69; *Briggs* v. *National Industries, Inc.*, 92 Cal.App.2d 542, 546 [207 P.2d 110]. In *Hill* v. *Matthews Paint Co.*, 149 Cal.App.2d 714, 723 [308 P.2d 865], it is said:

---

[2]There is no showing here that the particular allergy is common to any substantial number of possible users.

"When there is evidence that the injury may be reasonably attributed to a cause for which no liability attaches to defendant, it is proper to find against plaintiff on the issue of negligence"—and we may add, "breach of warranty."

Allergy to defendant's particular drug falls in the category of possibilities and not probabilities and the preponderance of authority is to the effect that the manufacturer's warranty does not run in favor of such allergic person. ▇▇▇ To this effect see, *Zager* v. *F. W. Woolworth Co.*, 30 Cal.App.2d 324, 332-333 [86 P.2d 389]; *Briggs* v. *National Industries, Inc., supra*, 92 Cal.App.2d 542, 546; *Mogensen* v. *Hicks*, 253 Iowa 139 [110 N.W.2d 563, 566-567]; *Casagrande* v. *F. W. Woolworth Co.*, 340 Mass. 552 [165 N.E.2d 109, 111-112]; *Bonowski* v. *Revlon, Incorporated*, 251 Iowa 141 [100 N.W.2d 5, 7-9]; *Vanoven* v. *Hardin*, 233 Ark. 301 [344 S.W.2d 340, 343]; *Cumberland* v. *Household Research Corp. of America* (D.C. Mass. 1956) 145 F.Supp. 782, 785; *Hanrahan* v. *Wallgreen Co.*, 243 N.C. 268 [90 S.E.2d 392, 393]; Note entitled Unusual Susceptibility to Injury, 26 American Law Reports 2d 963, 966-967. At page 966 of said annotation it is said: "Although there are decisions to the contrary, generally it has been held that in an action by the buyer of a product against the seller for breach of warranty to recover damages for injuries resulting from the use of the product, there is no liability upon the seller, where the buyer was allergic or unusually susceptible to injury from the product."

In *Merrill* v. *Beaute Vues Corp., supra* (10th Cir. 1956) 235 F.2d 893, 897, it is said: "We therefore have the question as to whether a manufacturer who places a product on the market, knowing that some unknown few, not in an identifiable class which could be effectively warned, may suffer allergic reactions or other isolated injuries not common to the ordinary or normal person, must respond in damages. Although there is authority to the contrary, we think the prevailing and better rule is that the injured persons in such cases cannot prevail. The reason generally given for the rule is that the injury is caused by allergy or the unusual susceptibility of the person and not the product. The essence of these decisions is that a reasonable person could not foresee the purchaser's condition and could not anticipate the harmful consequences. In the case at bar, as in similar cases, the plaintiff herself did not know that a usually harmless product could cause injury to her optic nerve. Until after the filing of the complaint, the defendants had no knowledge of like in-

juries to others, and then only two were reported. Under the circumstances, a warning would have been wholly ineffective."

We conclude that there was no error in the refusal of the tendered instruction on warranty.

## II.

Appellants complain of the admission into evidence of the concluding paragraph of a report of the Council on Drugs of the Journal of the American Medical Association dated October 12, 1957. The matter arose thus. Plaintiffs' counsel had propounded numerous interrogatories to defendant and as part of their case plaintiffs' attorney read to the jury most of the interrogatories and answers thereto. The procedure was for plaintiffs' attorney to read the questions and defense counsel the answers. Interrogatory No. 15 and the answer thereto were as follows: "How many cases of Agranulocytosis have been fatal? Answer: See published report attached to Interrogatories." The statement shows that this referred to the report now under discussion. Defense counsel without objection read the whole document until the last paragraph was reached, whereupon plaintiffs' counsel objected thereto. He carefully limited his objection, saying: "May the record show that I am objecting only to the last paragraph of the document as a self serving declaration and hearsay." The portion read without objection contains the following: "Although depression of granulocytes was prominent in every case reported, the bone marrow studies in some cases indicated a depression of other cellular elements as well. Of the eighteen known cases, we have information that four ended fatally. In cases that were identified early, cessation of use of the drug and institution of appropriate measures were usually followed by fairly prompt recovery. Physicians who prescribed Promazine Hydrochloride (Sparine) (added) should instruct attendants, nurses, and patients to discontinue the use of the drug and to report immediately if there is any sudden occurrence of symptoms such as sore throat, fever or malaise. These instructions must be stressed. The interim blood cell counts alone cannot be relied upon because the condition could develop suddenly between routine examinations." The last paragraph: "Wyeth Laboratories has included a forceful warning and has placed it prominently in the leaflet available to the medical profession. The firm should be commended for its diligence and willingness to cooperate with the sub-committee in its effort to bring this matter to the attention of physicians. Since the drug may possess potential for some

harm, the sub-committee suggests that physicians limit its use to those conditions in which such use is warranted and avoid its use in the treatment of trivial or minor complaints.''

There is a real question whether the objection was available to plaintiffs' counsel when made by him, for the entire document seems to have been offered in evidence by plaintiffs as part of their offer of the interrogatories and answers thereto. But the record is not entirely clear on this and we consider the objection on its merits. Thus viewed it clearly was well taken.

Said last paragraph, emanating from no official source, but from a voluntary association of physicians, consisted of a series of hearsay statements and laudatory conclusions of said persons for which no foundation had been laid. And the doctrine that offer of a part of the document opens the way for the opponent to prove the rest is not here applicable. The statute (Code Civ. Proc., § 1854) and the cases applying it do not extend to the offer of an additional portion of the document which is not necessary to make it understood, does not explain it and is not relevant thereto. The cases are numerous, including *People* v. *McCoy*, 25 Cal.2d 177, 187 [153 P.2d 315]; *Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237, 250 [116 P. 513]; *People* v. *Snyder*, 50 Cal.2d 190, 195 [324 P.2d 1]; *Crosby* v. *Martinez*, 159 Cal.App.2d 534, 539 [324 P.2d 26]; *People* v. *Valles*, 197 Cal.App.2d 362, 370 [17 Cal.Rptr. 204]; *People* v. *Albert*, 182 Cal.App.2d 729, 741 [6 Cal.Rptr. 473].

 This last paragraph of the document plainly was inadmissible but not prejudicially erroneous, for it appears in an undisputed background showing that the warning issued by Wyeth was adequate, that it was intended only for the physicians, was received and read and understood by decedent's physician. Under these circumstances the opinion of the American Medical Association or its committee concerning the merits of what Wyeth had done was surely irrelevant and immaterial but not calculated to mislead the jury.

### III

 There was no error in excluding the proffered and professed copy of report of Committee on Judiciary of the United States Senate. The engrossed statement says: ''That the purported report of the Committee on the Judiciary United States Senate was not certified, nor marked for identification. Counsel for defendant objected to the portions of the report which plaintiffs' counsel attempted to offer in evidence

on the grounds that said portions of the report were immaterial, irrelevant and no proper foundation was laid for said report." And: "Defense counsel does not know and does not stipulate that the purported excerpt is a true and correct copy of said alleged report." The photostatic copy attached to the statement bears no sort of authentication. The fact that it is printed or bears the endorsement "June 27, 1961—Ordered to be printed. U.S. Government Printing Office Washington, 1961" does not measure up to the requirement of the federal statute relating to authentication of such documents,[3] or California Code of Civil Procedure, section 1918, subdivision 2,[4] or the pertinent authorities. (See *Southern Pac. Co.* v. *Fish,* 166 Cal.App.2d 353, 364 [333 P.2d 133] ; *Marks* v. *Orth,* 121 Ind. 10 [22 N.E. 668, 669].) Not every report made to a public body is admissible in evidence as an official document. (*Reisman* v. *Los Angeles City School Dist.,* 123 Cal. App.2d 493, 506 [267 P.2d 36].)

Perusal of this unauthenticated document discloses that its subject matter had no place in this case wherein it appears without contradiction that Sparine is an effective drug when used in accordance with the Wyeth directions to the doctors. Nor does it impeach, as counsel contends, the last paragraph of the American Medical Association report above discussed.

## IV

 Defendant's witness, Dr. Keith Ditman, is a highly qualified expert, as appears from his preliminary testimony. He "testified that he has used Sparine and promazine drugs since they were put on the market in 1956 and that he has used these drugs in hundreds of cases; that the Council on Drugs of the American Medical Association, on occasion, solicit his opinion as to particular drugs. He testified that in his opinion, Sparine is a safe and adequate drug; that, in fact, Sparine is safer than most similar drugs in that it has fewer side effects, and in other particulars." Then the following occurred: "Question by Mr. Spray: 'Doctor, in your medical

---

[3]28 U.S.C.A. § 1736: "Extracts from the Journals of the Senate and the House of Representatives . . . *certified by the Secretary of the Senate or the Clerk of the House of Representatives shall be received in evidence* with the same effect as the originals would have." (Italics added.)

[4]Code Civ. Proc., § 1918: "Other official documents may be proved, as follows: . . . 2. The proceedings of the Legislature of this state, or of congress, by the journals of those bodies respectively, or either house thereof, or by published statutes or resolutions, or by copies certified by the clerk or printed by their order. . . ."

opinion, is that warning on there (referring to direction circular) adequate?' Hawkins: Objection—Asking a Doctor for a matter that is an issue of the lawsuit, one of the main issues, he would invade the province—Mr. Spray: These are technical problems I think we need an expert opinion on—This is a very technical subject. Court—'Overruled—You may answer.' Answer: 'It is as adequate as it can be, there is nothing more that could be put in here.' '' Then he added that "the drug Sparine had been approved as to efficacy and other particulars by the Federal Food and Drug Administration, and that said agency had likewise approved the Direction Circular and label as to form and content."

In essence plaintiffs' objection was that the question went to one of the ultimate issues in the case. That is not a conclusive objection. So held in *People* v. *Wilson,* 25 Cal.2d 341, 349 [153 P.2d 720]; *People* v. *Cole,* 47 Cal.2d 99 [301 P.2d 854, 56 A.L.R.2d 1435]. In the last cited case the court said, in part, at pages 104-105: "We are aware that cases in some jurisdictions have held that testimony of this type is not admissible. . . . In our opinion, however, they do not represent the better view with respect to whether the trier of fact would ordinarily be in a position to determine, as intelligently as a doctor, whether a wound was self-inflicted. Moreover, some of these cases rest, at least in part, upon the ground that the opinion of the doctor would go to an ultimate issue of fact to be resolved by the jury, whereas in this state we have followed the modern tendency and have refused to hold that expert opinion is inadmissible merely because it coincides with an ultimate issue of fact." Witkin, California Evidence, section 200, page 221: "Many cases purport to state a general rule excluding an opinion on an *ultimate basic issue* of the case. The theory is that such conclusions are for the jury to make, and that offering an opinion which is directly decisive of the case *invades the province of the jury.* . . . But no reliable test of an 'ultimate issue' can be devised, and both by statute and case law certain opinions in this area have been regularly admitted; e.g., on sanity, handwriting and value. (See *infra,* § 203.) Most writers have condemned the strict exclusionary rule as unsound in principle, and inconsistent and unworkable in practice. (See 7 Wigmore, § 1921; McCormick, p. 27; 2 U.C.L.A. L.Rev. 359.) It is expressly repudiated by the Model Code (Rule 401) and the Uniform Rules (Rule 56 (4) ). And the trend of modern decisions, in California and

elsewhere, is to admit such opinions whenever they are useful."

Without doubt this was a question upon which the ordinary man is unable to reach an informed conclusion and hence one upon which opinion evidence is desirable and competent. (*People* v. *Cole, supra,* 47 Cal.2d 99, 103-105.)

 However, a more conclusive answer to appellants' argument is the fact that there was not then or later any evidence indicating inadequacy of the warning.[5] The attending physician read and understood it but failed to heed its admonition or follow its prescribed procedure. The witness' answer to this question added nothing to the record otherwise written and could not be said to be prejudicial even if erroneously received. There was no error in this ruling.

## V.

 In the course of his opening statement to the jury, counsel for defendant remarked: "And I think the evidence will also indicate that Mrs. Magee from the doctors has already received $23,500.00." The settled statement shows that this was true in the sense that all defendants other than Wyeth had paid plaintiffs said sum for a covenant not to sue further. "That no objection was made to this portion of defense counsel's opening statement, nor was any objection interposed when defense counsel asked Mrs. Magee if it wasn't true that the doctors and nurses had paid her $23,500.00 in connection with her husband's death." It is established that a nonpaying alleged joint tortfeasor is entitled to credit of any such payment upon an award of damages against himself, that the jury properly may be instructed to give such credit before returning a verdict. *Laurenzi* v. *Vranizan,* 25 Cal.2d 806, 813 [155 P.2d 633]: "The distinction is recognized in Restatement of the Law of Torts, section 855, where it is stated that, although a covenant not to sue does not discharge another who is liable for the same harm, payments by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment. Since the plaintiff can have but one satisfaction, evidence of such payments is admissible for the purpose of reducing *pro tanto* the amount of the damages he may be entitled to recover." See also,

---

[5] According to Dr. Ditman, "Sparine is a safe and adequate drug; that, in fact, Sparine is safer than most similar drugs in that it has fewer side effects, and in other particulars."

*Reeder* v. *Hoag,* 158 Cal.App.2d 41, 43 [321 P.2d 793]; *Reinach* v. *City & County of San Francisco,* 164 Cal.App.2d 763, 768 [331 P.2d 1006]; 42 California Jurisprudence 2d section 34, page 735; Note 104 American Law Reports 931. This rule was enacted as a part of the Code of Civil Procedure in 1957, through adoption of section 877.[6] As we have in the record none of the instructions given by the court, it is presumed that the matter was appropriately covered. Hence the mention of the subject in the opening statement of counsel was neither erroneous nor prejudicial.

The theory is that joint tortfeasors are jointly and severally liable. Hence, payment by one or more of them as part of the injured party's damages is a discharge of their joint obligation and hence those remaining in the action are entitled to credit therefor when it appears through an adverse verdict that they were in fact joint tortfeasors. Cases relied upon by plaintiffs (*Savoia* v. *Moorehead,* 83 Cal.App.2d 147 [188 P.2d 260]; *Amore* v. *Di Resta,* 125 Cal.App. 410 [13 P.2d 986]; *Baroni* v. *Rosenberg,* 209 Cal. 4 [284 P. 1111]) are not to the contrary. They involve situations in which the injured person has received from an outside source some compensation such as insurance which emanates from an expenditure of money or services of the plaintiff and in no sense from the wrongdoers; to give them credit for such payments would amount to unjust enrichment of an aggravated sort. See *Anheuser-Busch, Inc.* v. *Starley,* 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198]; 14 California Jurisprudence 2d section 122, page 747.

The judgment is affirmed.

Fox, P. J., and Herndon, J., concurred.

---

[6]Code Civ. Proc., § 877: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort——

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."