[Civ. No. 30171.   Second Dist., Div. Five.   Nov. 29, 1967.]

VELMA A. HUTCHINSON, Plaintiff and Appellant, v. REVLON CORPORATION OF CALIFORNIA et al., Defendants and Respondents.

518

Richard E. Posell for Plaintiff and Appellant.

Moss, Lyon & Dunn, Dunn, Lyon, Haight & Nye, Robert C. Nye and Henry F. Walker for Defendants and Respondents.

KAUS, P. J.—Plaintiff appeals from a judgment in defendants' favor. Trial was to a jury. All issues on appeal relate to the instructions.

## FACTS

On September 8, 1961, plaintiff asked her daughter to buy her a bottle of ''Hi and Dri,'' a deodorant manufactured and marketed by defendant which plaintiff had seen advertised on television. It was a very warm day; plaintiff was perspiring rather profusely; she was dressing to go to a business luncheon meeting; she applied the ''Hi and Dri'' under her arms and under her breasts. It was the first time she had used this particular brand of deodorant and the first time she had ever used any deodorant under her breasts.

About 15 minutes after application of the ''Hi and Dri'' the area under plaintiff's breasts began to ''tingle'' and was uncomfortable. Approximately one-half hour later the discomfort became more severe. She examined the affected area and found it was ''quite red, angry looking . . .'' She showed the area to her daughter and then sponged it off with warm water. She experienced some relief but some pain persisted and the area remained red and became progressively more painful throughout the day.

The following day appellant noticed tiny blisters in the affected area; the second day after use of the ''Hi and Dri'' the entire area broke out in small blisters; on the third day the blisters got larger and ran together; on the fourth day the skin came off and the area was ''completely raw.'' That day she went to a doctor who prescribed medication which she used as directed.

A few days after the skin came off, cracks appeared in the affected area; ''an excretion'' came from it, accompanied by ''a very obnoxious odor.'' The odor prevented her from associating with people until about April 1962 and interfered with her marital relations. The irritation also prevented her dressing normally, thereby forcing her to remain indoors.

Plaintiff had no reaction from the use of ''Hi and Dri'' under her arms.

A chemist, called as an expert witness by plaintiff, testified that he had analyzed the contents of the bottle of ''Hi and

Dri'' used by plaintiff; that the list of ingredients on the bottle label guided his analysis; that his analysis revealed the presence of aluminum chlorhydrol and neomycin sulfate, two of the ingredients listed on the label. He characterized aluminum chlorhydrol as an astringent and an acid. Neomycin sulfate was an antibiotic and a complex organic substance. Both could be irritants to the human skin. On cross-examination, however, he admitted that these ingredients would be irritating only to those persons with more than usual sensitivity to acidity.

Defendant's[1] senior vice president testified as to the procedure followed by the defendant in testing products prior to marketing them generally. He testified that he had never heard of deodorant being applied under the breasts.

Doctor LeVan, a dermatologist called as an expert witness by defendant, testified that ''Hi and Dri'' applied to ''normal skin'' would not produce the condition which it produced in plaintiff. The doctor had not examined plaintiff, but rendered his opinion on the basis of photographs of her condition admitted in evidence, his observation of her in the courtroom and his experience as a dermatologist. He concluded that the skin under plaintiff's breasts was in a macerated or softened condition at the time the ''Hi and Dri'' was applied to the area. This conclusion was based on the fact that plaintiff had large pendulous breasts which rested against her body preventing evaporation of perspiration. The resulting accumulation of moisture resulted in a condition of the skin under the breasts akin to the soggy whiteness of hands left too long in water.

Doctor LeVan testified that maceration ''has the effect of destroying the No. 1 protective element of the skin,'' and that the boggy or macerated condition could exist without the subject knowing of it or having reason to know of it.

Doctor LeVan further testified that he had patients who used deodorants elsewhere than under their arms, including under their breasts, that those with normal skin experienced no trouble, but that those with abnormal skin would experience burning and irritation.

The doctor testified that the fact that the irritation of plaintiff's skin had lasted so long indicated that the skin was

[1]Although two defendants, Revlon, Inc., and Revlon Corporation of Califorina, answered the complaint, both defendants were treated alike for all purposes throughout the trial and, for simplicity, we refer to them in the singular.

not normal, that if the skin had been normal the condition would have cleared up within 10 days.

Plaintiff's skin under her breasts was abnormal in this: when moisture mascerates the skin, as described by the doctor, certain hygienic procedures which he recommends to his patients will prevent the skin from becoming abnormal. As he put it: "We have certain procedures of hygiene that one employs to offset this. The common one is to use a very fine zinc sterate, which is a drying agent, which has to be removed every night, otherwise it cakes and actually irritates the condition. A zinc sterate drying powder under there keeps that skin in the normal amount of hydration so that all women with pendulous breasts and with sweating under there do not develop abnormal skin.

"Now, it is true that the vast majority of those that come into my office have this yeast infection or this fissure under the breast and that is why they come in. There are many others or these same patients, a year later, don't come in because now they're providing for some absorption under there. Sometimes they use absorptive pads under the breasts."[2]

The label on the bottle of "Hi and Dri" bore the legend: "Caution: Do not apply on broken skin or if a rash develops." It contained no warning restricting use to the under arm area. Plaintiff testified that she did not read the label except for the product name "Hi and Dri."

## THE ISSUES

The complaint was filed on September 6, 1962. *Greenman* v. *Yuba Power Products Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], was decided more than four months later. It is not surprising, then, that the complaint proceeds on theories of negligence and the implied warranties of merchantability and fitness for a particular purpose. (Former Civ. Code, § 1735.)

Undoubtedly, had the complaint been drafted with *Greenman* in mind the words chosen by the pleader would have been different, although they would have said the same thing. In

---

[2]From the above summary of Doctor LeVan's testimony it appears arguable that plaintiff's strong reaction to the application of Hi and Dri was not due to an unusual susceptibility or allergy. (See *Magee* v. *Wyeth Laboratories, Inc.*, 214 Cal.App.2d 340, 353 [29 Cal.Rptr. 322] and authorities cited therein.) Inferably what happened to plaintiff would happen to any woman with pendulous breasts who does not pursue a course of treatment such as the one prescribed by the doctor for his patients.

any event, a close inspection of the record convinces us that at the trial it was tacitly assumed by all parties that a cause of action based on *Greenman* was legitimately before the court. In his argument opposing defendant's motion for a non-suit, plaintiff's counsel strongly relied on *Greenman*. Defense counsel did not protest. The motion was denied. Further, as will be seen, the court gave BAJI 218A—an instruction based on *Greenman*. The instructions were shown to both counsel. There was no objection by the defense. We realize, of course, that the defense was under no obligation to object to an instruction to preserve its right to complain of any error on appeal. (Code Civ. Proc., §§ 607a, 647.) The point we make is simply that the record supports our conclusion that the issue of liability under the principles announced in *Greenman* was in issue.

### INSTRUCTIONS

■    Plaintiff's principal complaint is the failure of the trial court to give an instruction which is a truncated version of the tort defined in *Greenman*. It was incomplete though correct as far as it went. While it would not have been error to give it, (*Merrill* v. *Buck*, 58 Cal.2d 552, 563, headnote 11 [25 Cal.Rptr. 456, 375 P.2d 304]) neither was it error to refuse it. (*Ibid.*, headnote 12.)

In the precise way in which the argument is presented, plaintiff's point has no merit. Yet we feel strongly that strict adherence to appellate etiquette would produce a miscarriage of justice in this case. The law is clear that it is within our power to prevent this. (*Burns* v. *Ross*, 190 Cal. 269, 275-276 [212 P. 17]; *Johnson* v. *Drew*, 218 Cal.App.2d 614, 621-622 [32 Cal.Rptr. 540]; *People* v. *Renchie*, 201 Cal.App.2d 1, 7 [19 Cal.Rptr. 734]; *People* v. *Ross*, 198 Cal.App.2d 723, 730 [18 Cal.Rptr. 307]; *Escobedo* v. *Travelers Ins. Co.*, 197 Cal. App.2d 118, 127 [17 Cal.Rptr. 219]; cf. *Desny* v. *Wilder*, 46 Cal.2d 715, 729 [299 P.2d 257].) There can be no question that plaintiff was entitled to have the jury instructed on a theory of recovery which did not require proof of Revlon's negligence. As we will show, her attorney did request two such instructions, but nevertheless by a series of quirks the jury was, in effect, not instructed on any theory except negligence.

This is what happened: As far as the warranty of merchantability is concerned, plaintiff asked for no instructions and none were given. Nor did she request the then standard instruction on the implied warranty of fitness (BAJI 403).

She did, however, request and the court did give BAJI 402-B[3] which covers much the same ground. However, any comfort which plaintiff gained from BAJI 402-B was neutralized by the giving of 403-B[4] at defendant's request.

We think it was error to give BAJI 403-B under the facts of this case. If a consumer purchases an article in reliance on the manufacturer's advertising of that article under its trade name, the warranty of fitness by the manufacturer cannot be negatived by the fact that the manufacturer has given the product a trade name. The provisions of section 1735, subdivision (4) of the Civil Code[5] are intended to deal with the situation where the consumer-buyer selects from the merchandise offered to him by the retailer a particular brand which he desires. The reason for the rule was explained by Justice Cardozo in the leading case, *Ryan* v. *Progressive Grocery Stores Inc.*, 255 N.Y. 388 [175 N.E. 105, 74 A.L.R. 339]: "There is no room for a holding that choice shall be imputed to the seller when the transaction shows upon its face that the judgment of the seller was superseded, and choice determined by the buyer." (*Ibid.*, p. 391.) Such reasoning is manifestly not in point where the defendant is not an intermediate seller, but the manufacturer of the product whose television pitchmen persuade the buyer to choose it above all others.[6]

We do not believe that the error was cured by the giving of the following instruction: "You are instructed that

---

[3] "If a manufacturer advertises or labels a product as consisting of certain ingredients, or as suitable for a given purpose, he thereby so warrants it to any person who in reliance thereon purchases the product and puts it to the use contemplated by the label or advertisement."

[4] "When the buyer purchases a specific article which he has selected under its patent or trade name, the seller cannot be held liable on an implied warranty that this article is fit for the particular purpose for which the buyer may have bought it.

"If, however, the buyer relies on the skill or judgment of the seller to select an article suitable for the buyer's known purpose, a warranty of fitness for that purpose may be implied although the thing which is sold has a patent or trade name.

"Thus, one of the questions for you to decide is whether the . . . in this case was selected by the buyer under its trade name or whether the buyer relied on the seller's skill or judgment in making the purchase."

[5] "In the case of a contract to sell or a sale of specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

[6] Defendant has never taken the position that either before or after *Greenman* privity was required to state a cause of action based on warranty. It would have been futile to do so. (*Rogers* v. *Toni Home Permanent Co.*, 167 Ohio St. 244 [147 N.E.2d 612, 75 A.L.R.2d 103]; see cases collected in 79 A.L.R.2d 431, 445-446.)

by the sale of the product here in question in the manner shown by the evidence, the law implies a warranty on the part of the defendant that the product was reasonably safe and fit for the purpose intended, namely, for the application to the skin by the public generally. This warranty, however, does not extend to exceptional cases involving circumstances which the manufacturer of the product could not reasonably be expected to know or anticipate where the product, although safe and suitable for the use by the public generally, may, by reason of some unusual sensitivity peculiar to an individual person, be harmful if used by such individual. In such case, the product is reasonably fit for the purpose intended, namely, for use by the public.''

It is true, of course, that this tells the jury that the law, in the case at bar, implied a warranty of reasonable fitness; but the instruction and BAJI 403-B are irreconcilable. In BAJI 403-B the jury is told that there is no warranty of fitness if the product is ''selected under its patent or trade name'' which is precisely what plaintiff did. There was no evidence that she relied on the skill and judgment of Revlon in selecting the product, as distinguished from manufacturing it.

''The rule is thoroughly settled that where conflicting instructions are given the verdict of the jury cannot be sustained.'' (*Westberg* v. *Willde,* 14 Cal.2d 360, 371 [94 P.2d 590]. Although there are exceptions to this rule (*Essick* v. *Union Pacific R.R. Co.,* 182 Cal.App.2d 456, 463 [6 Cal.Rptr. 208]) we think the rule, rather than any exception, is applicable.

Arguably no harm is done even if BAJI 403-B is given, if the court properly instructs on the *Greenman* theory. The court here did give the jury BAJI 218-A[7] but unfortunately it was given in such a manner that the jury could not have understood its full import.

It was preceded by an instruction defining negligence (BAJI 101 revised) and ordinary care (BAJI 102 revised); an instruction on the right to assume normal faculties in others (BAJI 138-C); the definition of contributory negligence (BAJI 103-1) and the standard proximate cause instruction

[7] ''The manufacturer of an article who places it on the market for use under circumstances where he knows that such article will be used without inspection for defects, is liable for injuries proximately caused by defects in the manufacture or design of the article of which the user was not aware, provided the article was being used reasonably for the purpose for which it was designed and intended to be used.'' The instruction was approved in *Preston* v. *Up-Right Inc.,* 243 Cal.App.2d 636, 640-641 [52 Cal.Rptr. 679].

(BAJI 104). It was followed by the following instruction: "In this case plaintiff seeks to establish liability on two different theories including negligence and breach of warranty. *The court has given you certain instructions on the law of negligence.* I will now instruct you on the law pertaining to warranty. A breach of warranty may be established without proof of negligence on the part of the defendant.''

Then there followed such instructions on breach of warranty as were given. We are convinced that by the unfortunate sequence in which the court instructed the jury, the impact of BAJI 218-A was psychologically hidden from the jury. Given as part of the instructions on negligence, a lay-jury undoubtedly felt that it was simply being instructed to the effect that there was a right—duty relationship between manufacturer and consumer and that the duty involved was merely one of reasonable care.

▮ The judgment must therefore be reversed for failure to instruct on any theory that did not require proof of negligence. In doing so we are not suggesting that in this and similar cases the plaintiff is always entitled to go to the jury on the *Greenman* doctrine of strict liability in tort and assorted warranties as well. In most cases the plaintiff gets all he needs if the jury is properly instructed on the manufacturer's strict liability in tort. Warranty instructions merely confuse the picture.

▮ Plaintiff also complains of the trial court's refusal to give the instruction quoted in the footnote.[8] The requested instruction was improper. There was no evidence of any complaints to defendant. Defendant also maintains that the instruction should not have been given because plaintiff did not read such warning as there was on the bottle. This is not dispositive of the point. The very defect in a warning may lie in its failure to call attention to itself.

The judgment is reversed.

Hufstedler, J., and Stephens, J., concurred.

A petition for rehearing was denied on December 18, 1967, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied January 24, 1968.

---

[8] "A manufacturer's duty to warn of the presence of harmful ingredients is not dependent upon the relatively small number of people who might be affected by the harmful qualities of a deodorant. Thus, even though there may be only a few complaints of injury, the manufacturer has a duty to warn of the possibility of such injury.''