EUGENIA JERRY, an Infant, by EUGENE JERRY, Her Father and Natural Guardian, et al., Appellants, *v.* BORDEN COMPANY et al., Respondents, et al., Defendant.

Second Department, July 1, 1974.

*Kelly, Callahan & Duffy (John J. Duffy* of counsel), for appellants.

*Mulholland, Minion & Roe (John F. Mulholland* of counsel), for the Borden Company, respondent.

*Montfort, Healy, McGuire & Salley (E. Richard Rimmels, Jr.* of counsel), for Parisian Beauty Salon, respondent.

Hopkins, Acting P. J. Eugenia Jerry, the infant plaintiff, suffered complete baldness after undergoing hair straightening treatment at the hands of defendant Parisian Beauty Salon using a product known as Vigorol, manufactured by defendant the Borden Company. This action, brought on her behalf, sought recovery of damages from both these defendants on four counts: (1) against Borden on the theory of negligence in preparing Vigorol and in failing to give proper warnings concerning its use; (2) against Borden for breach of an implied warranty of fitness for use; (3) against Parisian on the theory of negligence in the application of Vigorol and in failing to provide proper training to its employees in the use of Vigorol; and (4) against Parisian for breach of an implied warranty of fitness for use.[1] At the end of the plaintiffs' case, the Trial Term dismissed the causes of action for breach of warranty and for negligent manufacture. It held that questions of fact existed with respect to (1) the adequacy of directions and warnings given by Borden concerning the use of Vigorol and (2) the reasonableness of the conduct of Parisian in treating Eugenia with the hair straightener.

These issues and the additional issue of the contributory negligence of Eugenia as " a reasonably prudent 11-year-old " were submitted to the jury, which found that neither Borden nor Parisian was liable to Eugenia. Thereafter, the plaintiffs moved pursuant to CPLR 4404 to set aside the verdict and that motion was denied by the Trial Term. From the judgment and the order denying the motion the plaintiffs appeal. We reverse the judgment and the order and direct a new trial. The case should be submitted to the jury on the theory of strict liability in tort.

The proof at the trial established that Eugenia received hair straightening treatments at Parisian beginning in 1967. Four treatments using Vigorol were applied to Eugenia's hair at periodic intervals; the last treatment occurred in March, 1968. Her mother soon thereafter discovered a bald spot in Eugenia's hair and took her to Dr. Branche, Eugenia's pediatrician since 1963. He advised that the treatments be stopped and they were. Nevertheless, by February, 1969, Eugenia had become completely bald. Though a dermatologist was successful to an extent in stimulating a second growth, the returning hair was

---

1. The complaint also contained a fifth cause of action on behalf of the infant's father for reimbursement of medical expenses and loss of the infant's services.

very short and did not remain. In January, 1972 Eugenia was still bald. Though at the time of trial in May, 1973 a small growth of hair was in evidence, in the opinion of Dr. Branche Eugenia would be bald for the rest of her life.

The plaintiffs as part of their case proved that Borden, through its subsidiary Ozon Products, had manufactured Vigorol, a hair straightener, and that an operator in Parisian had applied Vigorol to Eugenia's scalp in treating her hair. The operator testified that she had followed the directions in applying the product, combing the hair with it for about 10 minutes and then leaving it on the hair for an additional 15 to 20 minutes, after which the hair was shampooed. The operator said that she had used Vigorol since 1964 and in 1967–1968 as many as a hundred times without an adverse reaction. However, Eugenia said that no patch test had been performed on her and that at the last treatment she experienced a burning sensation from the moment the product was applied; she said it remained on her head for 35 minutes before it was removed.

Both the operator and Dr. Branche testified that Eugenia's scalp was healthy and in good condition prior to the first treatment in 1967. Dr. Branche testified that there were no underlying causes for the loss of the hair except the hair straightener. In his opinion Eugenia's baldness was the result of the chemical properties of Vigorol, though he did not know their identity. In Borden's case the testimony disclosed that the principal ingredient was ammonium thioglycate, a salt composed of thioglycolic acid and ammonia.

Borden further established that more than two million bottles of Vigorol had been sold without any complaint of loss of hair. The use of rubber or plastic gloves by the operator was recommended by Borden because several Vigorol treatments by the operator might occasion irritations of the cuticles of her nails.

The question before us is whether on the plaintiffs' pleadings and proof only the issues of negligence in giving inadequate warnings and directions by Borden and the reasonableness of Parisian's conduct in treating Eugenia's hair should have been submitted to the jury. The pleadings allege causes of action for both negligent manufacture and breach of implied warranty against the defendants, and this is sufficient, we think, to permit the plaintiffs to advance the theory of strict liability in tort against these defendants.

We observe first that the rigid " theory of the pleadings " doctrine no longer survives in the Civil Practice Law and Rules (CPLR 3013; cf. *Lane* v. *Mercury Record Corp.*, 21 A D 2d 602,

affd. 18 N Y 2d 889; *Catli* v. *Lindenman,* 40 A D 2d 714; *Lewis* v. *Village of Deposit,* 40 A D 2d 730). There are, of course, differences between a cause of action for strict liability in tort and a cause of action for breach of warranty or a cause of action for common-law negligence (cf. *Codling* v. *Paglia,* 32 N Y 2d 330; *Rivera* v. *Berkeley Super Wash,* 44 A D 2d 316). These differences arise mainly as a consequence of the theory of the action, but not in the construction of the pleading itself to determine whether such a cause of action is available to the pleader. The test is simply whether the pleading gives notice of the transactions relied on and the material elements of the cause of action. The form of the complaint and the label attached by the pleader to the cause of action are not controlling (e.g., *Van Gaasbeck* v. *Webatuck Cent. School Dist. No. 1,* 21 N Y 2d 239). Here, the plaintiffs provided adequate notice of the transaction and the material elements of a cause of action in the complaint to constitute a ground of strict liability for tort against the defendant (cf. *Codling* v. *Paglia,* 32 N Y 2d 330, 342, *supra; Velez* v. *Craine & Clark Lbr. Corp.,* 33 N Y 2d 117).

The doctrine of strict liability for tort in the field of products generally sold and used is a recent development. Apparently its first judicial pronouncement came in the concurring opinion of the then Justice TRAYNOR in *Escola* v. *Coca Cola Bottling Co.* (24 Cal. 2d 453) in 1944, and afterwards the action found definitive expression in *Greenman* v. *Yuba Power Prods.* (59 Cal. 2d 57). Section 402 A of Torts of the Restatement of Law (2d) prescribes its scope as imposing liability on one " who sells any product in a defective condition unreasonably dangerous to the user ". A defect in the material used or in the manufacture of the article or in formulating the integral compound may render the product unreasonably dangerous. Comment *i* of section 402 A defines " unreasonably dangerous " as " dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Strict liability for injury due to a defective product has been inflicted on manufacturers of cosmetics (e.g., *McKisson* v. *Sales Affiliates,* 416 S. W. 2d 787 [Tex.]; *Hutchinson* v. *Revlon Corp. of California,* 256 Cal. App. 2d 517; *Garthwait* v. *Burgio,* 153 Conn. 284) and on the beauty parlor operator (*Newmark* v. *Gimbel's, Inc.,* 54 N. J. 585). If the elements of proof required to impose strict liability are met, no intrinsic unfairness to the manufacturer or the purveyor of the service and the product appears evident. Almost literally, the patron of a beauty parlor

depends both on the utility of the product and the skill of the operator to accomplish the result which the patron requests.

The elements of proof necessary to make out a case under strict liability are (1) that the product was in a defective condition on delivery, (2) that the product was unreasonably dangerous to the consumer, and (3) that the product was the cause of the injuries sustained (*Netzel* v. *State Sand & Gravel Co.*, 51 Wis. 2d 1; *Simmons* v. *Koeteeuw*, 5 Wash. App. 572; *Schenfeld* v. *Norton Co.*, 391 F. 2d 420; cf. Ann. 13 ALR 3d 1057, 1075). The party injured cannot rely on the fact of the injury after use of the cosmetics under the circumstances involved, as in the case of a claim under *res ipsa loquitur*; the product must be shown to have been defective (*Beetler* v. *Sales Affiliates*, 431 F. 2d 651; *Helene Curtis Inds.* v. *Pruitt*, 385 F. 2d 841; *Elliott* v. *Lachance*, 109 N. H. 481; *Thomas* v. *Gillette Co.*, 230 So. 2d 870 [La.], writ refused 255 La. 809). Hence, the plaintiffs on the retrial must establish that the product was defective at the time of application, either because of its composition or its manufacture.

The contemporary marketing practices of packaging and advertising of cosmetic products justify the elimination of some of the burdens which traditionally encumbered the plaintiffs in cases in which recovery was demanded for personal injuries incurred as the result of the use of the products. The consumer must be dependent on the ability and experience of the producer to deliver within the package an article designed and prepared to achieve the performance which the product is advertised to do. An untoward result invites inquiry, but proof of specific acts of negligence may well be beyond the reach of the consumer. In adjusting the balance of proof between the producer and the consumer, a question of fairness must be faced. The consumer is in the possession of the facts of the injury; it is no more than just that he be charged with the burden of proving proximate cause. But he rarely has any knowledge of the design or means of manufacture of the product. This may justly be placed on the producer to explain and the consumer need not prove specific acts of negligence on the part of the manufacturer or the seller.

In addition, as between the two, the consumer should be expected to assume the burden of showing a defect—that the product was poorly designed or improperly manufactured to accomplish the result bargained for. Sometimes—as in this case—the result is so startling that the consumer's burden is aided by establishing a causal connection between use and result,

together with expert testimony as to the nature of the ingredients used and their propensities. In other cases, where the use of the product does not result in such a bizarre injury, the proportions of the defect must be described in greater detail and demonstration.

The emphasis which the standard of care declared in section 402 A of the Restatement, to which reference was made above, places on the product as being " unreasonably dangerous " in relation to the consumer possessed of the knowledge ordinarily held in the community is consequently shifting and flexible according to the circumstances of the case. Where the processes of manufacture are arcane and closely guarded, the consumer's knowledge is necessarily limited, but where those processes are within the common ken, a higher understanding by the consumer must be exacted.

As the ingredients of Vigorol are known to the plaintiffs, it is incumbent upon them to prove that the product was defective either in formulation or in manufacture or in the manner of use; and that the defect caused Eugenia's injury. If the defect was in either the formulation or manufacture of the product, Borden is responsible to the plaintiffs, together with Parisian. If the defect was in the manner of use, Borden may be responsible, together with Parisian, in the event that Borden prescribed that use in its instructions.[2] But if Parisian alone was responsible for the injury as the result of the manner of use to which its operator put it, then Parisian and not Borden would be liable under the traditional theory of negligence. And, of course, if no defect in any respect is demonstrated by the plaintiffs, neither defendant would be liable.

In short, the doctrine of strict liability aids the plaintiffs in that it removes the need for privity (*Codling* v. *Paglia,* 32 N Y 2d 330, *supra*), or to prove specific acts of negligence (cf. *Suvada* v. *White Motor Co.,* 32 Ill. 2d 612). It is not, however, a doctrine of absolute liability; the producer is not an insurer. There must be shown to be a defect in the article when delivered to the consumer which was the proximate cause of the injury. It follows that the improper application of the product, absent a defect, fastens no liability on the manufacturer.

The Trial Term declined to allow the issue of negligent manufacture to reach the jury, limiting the liability of Borden to a failure to give proper directions and warnings. Both issues, we

2. Parisian may of course recover over from Borden under its cross complaint any damage which it is forced to pay to the plaintiffs in any of these circumstances.

think, should have been submitted. Although the plaintiffs did not present at the Trial Term with clarity the claim of strict liability which they now espouse on appeal, and the Trial Term might well have been misled as to the thrust of the complaint by the position adopted by the plaintiffs' counsel at the trial, under the circumstances we conclude that a new trial is warranted so that the question of strict liability may be determined by the jury.

However, we note that in the state of the record as it is before us, the issue of the contributory negligence of Eugenia should not have been submitted to the jury. On this record we see no proof of contributory negligence. Eugenia was in the hands of the operator using Vigorol; there was no evidence that she did anything which caused or aggravated her injury. The proof is to the contrary, that is, that on discovery of the first bald spot she discontinued further treatments and sought medical advice. Her evidence, too, excluded the existence of any allergic condition of which she suffered or was aware that might have contributed to the loss of hair.

At the new trial the plaintiffs are entitled to a charge, in the event that Dr. Machta, Borden's examining physician, is not called as a witness by Borden, that the jury may make the strongest inferences against Borden which the opposing evidence permits (*Noce* v. *Kaufman,* 2 N Y 2d 347, 353; cf. *Laffin* v. *Ryan,* 4 A D 2d 21, 26). Under the circumstances of this case, Dr. Machta was under the control of Borden and was not an independent contractor.

For the reasons stated, we reverse the judgment and the order, on the law and in the interests of justice, and grant a new trial, with costs to abide the event.

LATHAM, COHALAN, CHRIST and BRENNAN, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered June 25, 1973, and order of the same court, dated June 12, 1973, reversed, on the law and in the interests of justice, and new trial granted, with costs to abide the event.