[Civ. No. 21810.   Second Dist., Div. Two.   Apr. 3, 1957.]

JOHN C. HILL, Appellant, v. MATTHEWS PAINT COMPANY (a Corporation), Respondent.

Mitchell & Hibbert for Appellant.

Moss, Lyon & Dunn, Sidney A. Moss and Henry F. Walker for Respondent.

FOX, J.—By the instant action, plaintiff sought damages for losses sustained as the result of a fire allegedly caused by the spontaneous combustion of a spray material purchased from defendant. Trial was to the court without a jury. The court found for defendant and entered judgment accordingly. Plaintiff appeals.

Plaintiff's complaint comprises three causes of action. Count I alleges, in substance, that defendant breached an express oral representation, promise and warranty to manufacture a spray finish material "which would be safe and in all respects fit and proper for plaintiff's use and capable of drying within twelve hours." Count II is predicated on defendant's breach of an implied warranty to furnish a spray material fit and proper for plaintiff's use. The third count

charges defendant with negligence in manufacturing, selling and delivering to plaintiff a spray finish material that was both inherently dangerous and unfit for plaintiff's use. The answer, after admitting the sale of the spray, denied the above allegations and interposed the affirmative defense of plaintiff's negligence in application of the spray as proximately contributing to the injury.

The underlying issue presented is whether the evidence sustains the findings on which the judgment rests. In examining this question we are required, under conventional rules of appellate review, to state the evidence in the aspect most favorable to the prevailing party.

Since 1948 plaintiff had been engaged in the business of large-scale manufacture of novelty items of an ornamental nature.* His operations in 1950 were conducted in a plant in the city of Gardena. The items manufactured by plaintiff were subjected to a finishing process in which they were spray-painted. This was accomplished in four sheetmetal spray booths located in plaintiff's plant. Each spray booth contained a rotating wheel or turntable with 20 pedestals, on which the raw castings were placed for successive spraying with three different coating materials.

The spraying cycle in plaintiff's operations followed a set pattern. First, as the wheel or table rotated, each casting was sprayed with a coating of burnt umber lacquer, which was a "nitrate cellulose dope" used primarily as a sealer. Second, a coating of nonjell lacquer, with finely-ground copper powder added to give a bronze color, was applied on top of the base coat. Third, a final coating was applied to produce a glossy finish. Each coating was applied with the use of a spray gun fed by a hose connected to a gallon container attached to the wall outside the spray booth. Each coat was applied alternately, but in the same order, as the castings were rotated on the turntable. One entire spraying cycle took about 25 minutes.

The spraying booths were constructed and installed for plaintiff by a company specializing in such equipment. Each booth was equipped with an exhaust vent or duct used to draw fumes or overspray into the air outside the building. This apparatus consisted of a stack (duct) and fan placed in the top center part of the spray booth enclosure. The

---

*He has pursued this occupation, either as a hobby or as a small business, since 1937.

stack extended upwards running through and above the roof of the plant, thus enabling the overspray to be expelled outdoors. The fan was situated inside the stack, approximately 3 or 4 inches above the point where the stack joined the top of the booth. The fan was operated by a motor attached to the outside of the blower section of the stack. The fan was mounted in a housing, and a belt running through the side of the housing in an enclosed casing connected the fan to the motor.

Plaintiff testified that in 1948 he purchased all the spraying materials he used from the Andrew Brown Company. In 1950 or 1951, he began purchasing the first or base coating from the India Paint Company. Later, the India Paint Company also supplied him with the nonjell lacquer used for the second coating. The glossy finish material used in the third coat continued to be furnished by the Andrew Brown Company. Plaintiff testified he had never experienced any difficulty in the use of these products.

In August, 1953, one Chester Pollet was in the employ of defendant as a salesman whose duties were to visit prospective customers to solicit orders for defendant's finishing materials. Pollet was a layman not versed in the chemistry of paints and varnishes. He called on plaintiff for the first time on August 25, 1953, in the hope of obtaining business. Plaintiff informed Pollet that he was interested in obtaining a third coating material that would dry faster and harder than the substance he obtained from Andrew Brown, something that would ''dry overnight so it could be wrapped with paper, not stick.'' Pollet informed plaintiff that ''we would see if we could do that for him.'' Pollet testified he spent 20 minutes at plaintiff's place of business and was shown the spray booths and how the material was applied. He recollected only that plaintiff gave him a sample of the burnt umber material he was using and that he informed him that the materials he was using were lacquers and synthetics.

On August 28, 1953, Pollet delivered to plaintiff a 1-gallon sample of defendant's finishing material known as QD Synthetic Number 53-821. Pollet had previously sold this same compound to other customers. He told plaintiff he thought it would dry fast enough and hard enough to satisfy his requirements. When Pollet called on plaintiff three days later, he was told that the gallon sample had proved satisfactory. Plaintiff next ordered a 5-gallon sample ''to test the material further.'' On September 9, 1953, Pollet spoke to plaintiff

again at the latter's place of business. Plaintiff expressed satisfaction with the 5-gallon sample and gave Pollet an order for a 55-gallon drum of defendant's QD spraying compound.

On September 19, 1953, a fire broke out in plaintiff's place of business which caused the loss for which recovery is sought. The fire originated in the southwest spray booth then being manned by an employee of plaintiff known as Lito Ruiz Mendez (herein called Ruiz). While engaged in applying the first coating of spray (the burnt umber—not defendant's product) to the castings Ruiz observed a flame drop down from the fan onto the pedestal table. The table started to burn and the fire spread rapidly. Ruiz dashed from the booth to report the incident to Joe Guzman, who was at work in another booth. Ten seconds later, the fire had become very intense and smoke and flame enveloped the booth. The fire department was notified and fire-fighting equipment was dispatched to the scene.

Captain Craycroft, of the fire department, arrived with the fire engines and launched an investigation when the fire was extinguished. The southwest spray (Ruiz) booth had collapsed in ruins. In the debris Captain Craycroft found an electric fan and motor and identified it as being the same one introduced as Exhibit "G." He testified it was not an explosion-proof type of motor. After examining it, he dropped it a few feet from where he found it. Detective Lieutenant Morrison, assigned to the Arson Detail of the sheriff's office, picked up this motor from the ashes. He also testified that the motor was not of an explosion-proof type. Such a motor, he stated, may create either static electricity or give off a spark which could produce an ignition. All other motors observed by Lieutenant Morrison in the ruins were not of an explosion-proof type. Lieutenant Morrison testified he talked to one of plaintiff's employees (obviously Guzman) who stated he "saw fire and sparks coming out of the (southwest) spray booth from the stack or duct at the top of the spray booth." Based on his investigation, Lieutenant Morrison concluded there were two possible causes of the fire: (1) an accumulation of overspray in the duct system spontaneously igniting; or (2) a mechanical failure in the fan system in the duct.

Captain Craycroft testified that Guzman, when questioned about the origin of the fire, "told me that sparks from an electric motor ignited fumes from the lacquer." Captain Craycroft stated he made an investigation to determine the

cause of the fire and concluded it was caused by sparks from an electric motor. He testified the motor found in the debris of the southwest booth had no spark shield.

Plaintiff testified that Exhibit ''G'' was not, nor could it be, the type of motor or fan which was in operation in the spray booth. He estimated the inside diameter of the stack did not exceed 16 inches, whereas the outer diameter of the fan in Exhibit ''G'' is 17.7 inches. He stated Exhibit ''G'' was one of 13 fans and motors installed in the walls of the building to act as a hot-air exhaust. He testified that the motor operating the fan in the stack was explosion proof. Plaintiff's son gave testimony to the same effect.

Plaintiff testified he recommenced business operations at a new location on October 8, 1953, and continued to use defendant's QD product. About a week later, two fires, on successive days, occurred in a trash pile where overspray dust from defendant's product and other cleanouts from the spray booths had been thrown. On October 17, 1953, the overspray dust in one of the spray booths started to smoke. Plaintiff testified he discontinued operations for two days in an effort to learn the cause of these fires. On October 19 he resumed operations, this time reverting to the Andrew Brown product in place of defendant's QD material. He testified that no fires occurred after he ceased using defendant's QD spray.

Thereafter, using the expert services of chemists, engineers and technicians conversant with the properties of paint and sprays, plaintiff conducted a series of tests under conditions which assertedly reproduced the operation in which he was engaged at the time of the fire on September 19, 1953. The overspray dust and residuals emanating from defendant's QD materials were studied. The effect of the testimony, oral and documentary, adduced by these experts, who were witnesses for plaintiff, was to indicate that defendant's product had a dangerous tendency toward spontaneous ignition and would be hazardous to use in the spray cycle process employed by plaintiff. As epitomized by Ralph Huff, one of plaintiff's experts, the use of defendant's spray engendered a quantity of spray dust which oxidized rapidly, heated up, and burst into flame when accumulated ''to any degree,'' whereas such a reaction did not occur with the use of the Andrew Brown material.

Defendant's expert, Dr. Jeffreys, testified that after conducting various tests during the course of a month, he found that defendant's QD material was not a hazardous spraying

material when properly used. He attacked the validity of the tests performed by plaintiff's expert witnesses and ascribed the results obtained by them to the fact that they were made under conditions which did not parallel the situation during plaintiff's actual operations in the spray booth. He stated that he had conducted experiments under conditions simulating plaintiff's spraying cycle and found that there was no overheating produced by the use of defendant's product. He found no significant difference with respect to the effect of defendant's material on the overspray as compared to the Andrew Brown product. Dr. Jeffreys pointed out that all the materials used in the three coatings of plaintiff's spraying cycle were inflammable, that there is an ever present danger that the fan belt or motor might produce static electricity or friction heat that, in turn, could cause a spark that might ignite dust or overspray. The fan itself, he suggested, could strike a portion of the housing while momentarily unbalanced during its rotation and set off a spark that could ignite. In response to a hypothetical question postulating the employment of defendant's material in plaintiff's spraying cycle in conjuction with an explosion-proof motor, Dr. Jeffreys gave his opinion there would be no spontaneous ignition caused by the accumulation of overspray.

Plaintiff testified he knew that all the materials he used in his spray cycle were inflammable and that precautions were required when spraying at the time any of these coatings were used in the spraying process. Defendant's employees testified that the product here involved had been sold before and after plaintiff's fire to other customers without adverse results.

The court found against plaintiff on the issues of breach of express and implied warranties and negligence. It also found in defendant's favor on the question of contributory negligence.

Plaintiff's fundamental contention is that the fire was caused by a latent defect in defendant's spray material because it was negligently manufactured, and such defect consisted of its tendency to spontaneously ignite when used in plaintiff's spray cycle. As a result, plaintiff asserts defendant breached its duty of care as a supplier of a dangerous product and also breached the express and implied warranties that the product was reasonably fit for plaintiff's purposes.

Turning first to the question of breach of warranty, both express and implied, plaintiff's brief contains a compendium

of particulars, fortified by profuse citation to oral evidence and documentary proofs, which support his position with respect to these issues. Such labor is patently a duplication of the unsuccessful effort he made to persuade the trial court, and is conspicuous by its complete omission of rebuttal evidence of probative value adduced in defendant's behalf which was adopted by the trial court. ■ Arguments upon the weight of the evidence are irrelevant before a reviewing court once it is established that the judgment of the lower court rests upon substantial evidence. This is the situation which confronts us here.

The entire question here involved — whether defendant breached an express or an implied warranty — depends primarily on the facts. According to the findings of the trial court, those facts are all against plaintiff's contentions. These findings are supported by the evidence. ■ If in fact there were any warranties, the burden was on the plaintiff to show by a preponderance of the evidence that defendant had breached the warranties under which its spray material was sold. (*Dougherty* v. *Lee*, 74 Cal.App.2d 132, 135 [168 P.2d 54].) ■ However, defendant established by the testimony of its witnesses that its product was not hazardous when properly handled and was reasonably safe and fit for use as contemplated by plaintiff. There was evidence that plaintiff had used the spray material successfully for several weeks and that the product was one which defendant sold to other customers, both before and after the sales to plaintiff, without adverse incident. While plaintiff produced contrary evidence that could have supported a verdict in his favor, the point urged is controlled entirely by the conflict of evidence rule, in the face of which an appellate court will not interfere with the judgment. (*Baker* v. *Smith-Booth-Usher Co.*, 180 Cal. 309 [181 P. 56]; *National Elec. etc. Machines Co.* v. *Glick*, 83 Cal.App.2d 32 [187 P.2d 465].)

Passing now to the cause of action based on negligence, it is plaintiff's contention that defendant was negligent in failing to subject the spray material to proper and customary tests before delivering it to him. In this connection, plaintiff asserts that defendant made no tests to determine the spontaneous ignition qualities of its spraying compound, and the result of this omission was the sale to him of a product containing a latent defect which was hazardous when used in his spraying cycle. ■ Conceding, *arguendo*, that defendant was negligent in not testing its product, nevertheless,

in considering plaintiff's argument, we must be mindful of the following controlling rules of law: (1) To be entitled to a judgment based on negligence, plaintiff must prove that defendant's act of wrongful omission is the proximate cause of plaintiff's injury. (*Valdez* v. *Taylor Automobile Co.*, 129 Cal.App.2d 810, 821 [278 P.2d 91]; *Holmes* v. *Moesser*, 120 Cal.App.2d 612, 614 [262 P.2d 27].) ▉ (2) The burden of proof devolves on plaintiff to show the causal connection between the alleged negligence and the resulting injury. (*Petersen* v. *Lewis*, 2 Cal.2d 569, 572 [42 P.2d 311]; *McKellar* v. *Pendergast*, 68 Cal.App.2d 485, 489 [156 P.2d 950].) ▉ (3) Where the negligence proved is not fastened to the particular injury for which recovery is sought, "the case stands exactly as if no negligence had been proven." (*Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363, 364 [64 P. 480]; *Spencer* v. *Beatty Safway Scaffold Co.*, 141 Cal.App.2d 875, 880 [297 P.2d 746]; *Davis* v. *Lane*, 24 Cal.App.2d 400, 405 [75 P.2d 565].) ▉ (4) The question of whether plaintiff has sustained the burden of establishing that defendant's negligence was the cause in fact from which his injury resulted is ordinarily for the trier of the facts. (*Basin Oil Co.* v. *Baash-Ross Tool Co.*, 125 Cal.App.2d 578, 603 [271 P.2d 122]; *Been* v. *Lummus Co.*, 76 Cal.App.2d 288, 294 [173 P.2d 34].) ▉ (5) When there is evidence that the injury may be reasonably attributed to a cause for which no liability attaches to defendant, it is proper to find against plaintiff on the issue of negligence. (*Holmes* v. *Moesser, supra.*)

▉ Applying the foregoing rules to the present case, the testimony of Dr. Jeffreys, who made extensive tests of defendant's spray material, rebuts the contention that an accumulation of overspray from defendant's product under the conditions prevailing in plaintiff's spraying cycle would cause a spontaneous ignition and affirmatively establishes that it was nonhazardous and safe to use as a spray. Furthermore, from a consideration of the testimony of Fire Captain Craycroft and Detective Lieutenant Morrison, from the statements made by plaintiff's employees, from the fact that the accident occurred early in the morning at a time when the first coating rather than defendant's product was being applied, and from the fact that a nonexplosion-proof motor and fan apparatus was found in the debris of Ruiz's spray booth, the trial court could reasonably infer that the fire was caused by sparks and not by any defect in defendant's product. Since the evidence indicated that all the materials used in

plaintiff's spraying process were highly inflammable and it was sufficiently shown that sparks from the fan-motor assembly could have ignited the vapors, fumes or overspray produced in the course of spraying, the finding that there was no actionable negligence on defendant's part is in accordance with the reasonable probabilities established by the evidence. ██ "Before respondent could be held to answer in damages for the injuries suffered by appellant, it was incumbent upon the latter to assume the burden of proof and show by a preponderance of the evidence that the negligence of respondents was the proximate cause of the fire." (*Bartholomai* v. *Owl Drug Co.*, 42 Cal.App.2d 38, 42 [108 P.2d 36].) It is clear that, in the mind of the court, plaintiff failed to sustain the burden of proof incumbent upon him to show that any negligence of defendant was the proximate cause of the injury. ██ As has recently been stated by this court in *Spencer* v. *Beatty Safway Scaffold Co., supra,* page 882: "That defendant's negligence could *possibly* have been the cause, is not sufficient. The proof must be sufficient to raise a reasonable inference that the negligence complained of was the proximate cause of the injury. If that is not the result of the evidence, if the fact finder is left in doubt and uncertainty, he cannot base a verdict or finding on guess or conjecture [citations]."

Plaintiff relies heavily upon *India Paint & Lacquer Co.* v. *United Steel Products Corp.*, 123 Cal.App.2d 597 [267 P.2d 408], a decision of this court affirming a judgment based upon the trial court's findings of breach of warranties. Such reliance is misconceived. Our function, in that case, as it is in the matter *sub judice,* was to determine whether there was substantial evidence to support the findings of the lower court. Our scrutiny of the record developed a solid evidentiary basis for the judgment. The underlying fallacy of plaintiff's reliance on an authority such as the India case, where a judgment for plaintiff was affirmed on conflicting evidence, is his failure to recognize that a reviewing court cannot usurp the fact-finding function of the lower court and that the scope of our review extends only to a determination whether, in the case presented, the judgment rendered is supported by sufficient evidence. Thus, in the India case, we view the evidence from a perspective most strongly in favor of plaintiff, who there prevailed. Similarly, since defendant was successful below in the instant action, our orientation towards the evidence has proceeded upon the postulate

that questions of credibility of witnesses and conflicts in the testimony were weighed by the trial court and resolved in defendant's favor. We are not at liberty to reevaluate the evidence. When seen in this aspect, there is complete harmony between the India case and the instant matter, and what is equally important, adherence to the fundamental principles of appellate review.

Plaintiff's final contention relates to the admission in evidence of certain standards and regulations of the National Board of Fire Underwriters and General Safety orders of the Department of Industrial Relations of the State of California, which were received as Exhibits "K," "L," "M" and "N." If otherwise admissible, this evidence would be germane to the question of plaintiff's contributory negligence. ▉ However, since the views we have expressed on the issues of breach of warranty and negligence manifest that the findings thereon in defendant's favor find abundant support in the evidence and fully sustain the judgment rendered, the further finding that plaintiff was contributively negligent may be treated as mere surplusage. Thus, evidence erroneously received, assuming such was the case, directed to that issue becomes immaterial in terms of its effect upon the outcome of the case. ▉ "It is elementary law that if a judgment is amply supported by findings which are sustained by sufficient evidence, questions relative to other findings become immaterial upon appeal and may be disregarded. [Citations.]" (*Bohn* v. *Watson*, 130 Cal.App.2d 24, 41 [278 P.2d 454].)

The judgment is affirmed.

Moore, P. J., and Ashburn, J., concurred.