[Civ. No. 27750. Second Dist., Div. Three. May 19, 1965.]

E. JESCHKE, Plaintiff and Appellant, v. HEDY LAMARR et al., Defendants and Respondents.

Morton B. Harper and Morton R. Goodman for Plaintiff and Appellant.

Alexander, Inman & Fine and Maurice C. Inman, Jr., for Defendants and Respondents.

ASHBURN, J.*—This action was brought by an assignee for collection on behalf of attorneys Morton B. Harper and William G. Israel, who will be designated herein as plaintiffs or Attorneys. Defendants are Mrs. W. Howard Lee, also known by her professional name, Hedy Lamarr, or Miss Lamarr; also, two corporations wholly owned by her and respectively named Lamarr Productions, Inc. and Donau, Inc.

Plaintiffs herein had represented Miss Lamarr and her corporations and later had sued them, through an assignee for collection, to recover an unpaid balance for attorneys' fees. That suit—*Withers* v. *Lamarr et al.*—was contested and was

---

*Retired Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

508

pending in the Superior Court of Los Angeles County when on January 16, 1959, an agreement of compromise and settlement, bearing date November —, 1958, was executed between the parties. The Lamarr interests were therein "collectively referred to as 'Lamarr' " and their promises were made in that name as if there were an entity of some kind, thus resulting in joint and several obligations on their part.[1]

Plaintiff in the *Withers* action had $28,000 under attachment, and it was agreed that the attachment be released and the *Withers* action be dismissed with prejudice. The Attorneys caused these things to be done forthwith. The agreement provided that Lamarr pay to the Attorneys $10,000 (of a $25,500 settlement) upon execution of the agreement. This was paid promptly out of the moneys released from the attachment, and the remainder of $18,000 was turned over to Donau, Inc. The written agreement provided that Lamarr should also pay the Attorneys "an agreed balance" of $15,500, "said sum to be payable only out of the proceeds or funds accruing and payable to Lamarr Productions, Inc., Hedy Lamarr, and/or Donau, Inc., or any of them, whether for salary, producers fees, owner, or otherwise for any reasons whatsoever, by reason of any of the agreements set forth herein and identified as Exhibits hereto, or arising out of or connected with the pictures or the film materials in said agreements identified. It is expressly agreed that said additional sum of Fifteen Thousand Five Hundred Dollars ($15,500.00) shall be payable and shall be paid to Attorneys out of the first monies received by or payable to Lamarr and that Lamarr, individually and collectively, shall not receive or retain any of such funds until the stipulated sum payable to the Attorneys shall have been paid in full."

Lamarr had made a series of contracts with an Italian firm bearing a long name, which counsel have changed to Del Duca. We cheerfully adopt this abbreviation. Pursuant to those agreements two pictures entitled, "L'Amante di Paride" and "I Cavalieri del 'Illusione," had been produced with Hedy Lamarr as the star, but they never were distributed. Later it was agreed that they be combined into a single feature length picture entitled, "The Love of Three Queens." This series of agreements upon this general project were made between Lamarr and Del Duca extending over a period from October 7, 1953, to December 20, 1957. As security for per-

---

[1] We adopt this collective designation of the defendants.

formance by Lamarr of all obligations under said agreements, Lamarr on December 20, 1957, had mortgaged and pledged to Del Duca "all of its rights, titles and interests in and to the films, the pictures, and the film materials in said agreements identified." A copy of the pertinent "Mortgage of Chattels Pledge and Assignment" is attached to the compromise agreement (as Exhibit E to Exhibit 1 in evidence); it specifies a maximum debt of $301,666 owing from Lamarr to Del Duca.

In paragraph 4 of the compromise agreement, Lamarr undertakes as follows: "Lamarr agrees to do each and every thing necessary and required to complete the editing of such pictures and to place them in release and to comply with each and every obligation required by it to be performed under said agreements and said chattel mortgage; and to maintain and preserve the rights, titles and interests of Lamarr under said agreements so as to permit Attorneys to recover the balance of the stipulated compensation to them from proceeds obtainable through distribution of said motion pictures, films and film materials."

Paragraph 5 provides that if Lamarr had not completed by December 1, 1958, the editing and reediting work on the pictures and reentered into an agreement for distribution and exploitation as prescribed by the agreement of 1957 between Lamarr and Del Duca, "Attorneys may take over and finish the editing and completion of the picture and seek and enter into such distribution agreement. Lamarr agrees that promptly upon receipt by it or of any one of them, of notice from Attorneys that they elect to exercise their rights as set forth in this paragraph and to take over the film and film materials, then each of them will promptly turn over to Attorneys all films and film materials then in their or its possession or under their or its control, and will execute whatever documents of assignment and transfer which shall, in the opinion of Attorneys, be necessary to enable Attorneys to exercise such rights and to acquire possession and control of the film and film materials." The Attorneys thus became entitled to take over completion and distribution of the pictures and to pay themselves out of the proceeds the balance of $15,500 under the settlement agreement. This provision is immediately followed by "It is understood, however, that Lamarr has, by the 1957 agreement, granted similar rights to Del Duca and that such rights may be exercised by Attorneys only to the extent that Del Duca fails to or declines to exercise same or to the extent that Del Duca is willing that such rights

be exercised concurrently by said Attorneys or in association with said Attorneys, and nothing herein contained shall be construed to be in derogation of any rights heretofore granted to Del Duca or as limiting same.''

On February 20, 1959, Attorneys gave notice to defendants of an election to take over the distribution of the film based upon failure of Lamarr to enter into any agreement for distribution of ''The Love of Three Queens''; they also demanded that all film and film materials be promptly turned over to them, together with appropriate documents of transfer. None of these things was ever received for they were mortgaged to Del Duca and under its control.

On February 27, 1959, Del Duca's attorney gave notice upon its behalf (Exhibit 7) that default had occurred under the terms of the mortgage ''in that the payment to our client of the sum of $5,000, due under the provisions of Paragraph 5 of the Loan Agreement, [agreement of December 20, 1957] was not paid when due, on January 29, 1959, and the same remains due and owing.'' Then follows a statement that in the event the default is not cured by March 9, 1959, Del Duca will proceed to enforce its rights under its mortgage and Laboratory Pledgeholder's Agreement. The fact is that Attorneys never got possession of the mortgaged property and Del Duca never proceeded with its threatened foreclosure.

The instant action of Attorneys was filed on July 21, 1961. It complains of failure of Lamarr ''to preserve and maintain their rights under said agreements and chattel mortgage as specifically promised in said agreement, Exhibit 'A', thereby rendering it impossible for plaintiff's assignors to recover the stated balance due them from proceeds otherwise obtainable through the distribution of said motion pictures.'' However, the principal argument presented by counsel upon appeal is based upon the fact of nonpayment of the $5,000 due to Del Duca on January 29, 1959.[2]

---

[2] It was stipulated at the trial that the $5,000 payment was never made, but it was not one of a series of monthly payments as indicated in the court's memorandum of opinion and its findings. This $5,000 item flowed from an agreement of March 24, 1956, extending the maturity of a certain $10,000 payment to May 30, 1956, (Ex. D to Ex. 1 in evidence) and from paragraph 5 of agreement of December 20, 1957 (Ex. A to Ex. 1); times for payments of certain other sums were extended at the same time and in the same manner, but they were not monthly payments.

The mortgage secures performance of each of the Lamarr obligations upon the series of contracts concerning the picture; it specifically covers ''[a]ll rent, revenue, income, compensation and profits of Mortgagor from the release, exhibition, distribution, exploitation and market-

Counsel for appellants rely on the special fund doctrine and the contention that failure to make said $5,000 payment and to effect a distribution agreement and perform other obligations of Lamarr under the settlement agreement prevented the creation of the fund and thus rendered Lamarr personally liable for the unpaid balance of the settlement.

■ The rule is thus stated in 17A Corpus Juris Secundum, section 456d, page 582: "A contract or promise may be restricted to a particular fund, so as to make the existence or sufficiency of the fund a condition precedent to liability, in which case, in the absence of some fault of the promisor, the promise cannot be enforced until the requisite fund is realized." See also *Zogarts* v. *Smith*, 86 Cal.App.2d 165, 172 [194 P.2d 143]; *Johnson* v. *Meyer*, 209 Cal.App.2d 736, 742 [26 Cal.Rptr. 157]. ■ This rule is a part of the doctrine of anticipatory breach of contract. Such a breach creates a cause of action for damages (*Gold Min. & Water Co.* v. *Swinerton*, 23 Cal.2d 19, 29 [142 P.2d 22]; 17 Am.Jur.2d, § 449, p. 912 and § 453, p. 917), or a right of rescission, or a right to stand upon the contract until after failure of the promisor to perform on a stated date (17 Am.Jur.2d § 449, pp. 912-913). Thus the element of proximate causation enters into the problem. Quoting 13 Corpus Juris, the opinion in *Carpenter* v. *Elmer R. Sly Co.*, 109 Cal.App. 539, 547 [293 P. 162] says: " 'A contract or promise to pay may be restricted to a particular fund so as to make the raising or the sufficiency of the fund a condition precedent to the liability, and in such case

ing of the picture or of any rights therein and from all other sources in connection with any rights owned by Mortgagor relating directly or indirectly to the picture or the subject matter thereof, including but not limited to any and all sums due or to become due to Mortgagor under any distribution agreement relating to the picture, and all other rights of Mortgagor in and to each such distribution agreement;'' and the mortgage also provides that it is given for security for ''[payment, when due or at any time hereafter, of any and all other indebtedness now or hereafter owing by Mortgagor to Mortgagee and the prompt and faithful performance by Mortgagor of each and every agreement undertaking and obligation to be performed by the Mortgagor, whether pursuant to the provisions of this mortgage, the agreement or otherwise.'' A maximum indebtedness of $301,666 is prescribed. Concerning defaults, this instrument empowers the Mortgagee ''to accelerate and declare due and payable the entire indebtedness of Mortgagor to Mortgagee under the agreement and any note or notes given by Mortgagor to Mortgagee.''

The briefs before us contain considerable talk about defaults on sums other than the $5,000, but the record contains no showing of any notice of default or other procedure to enforce such other payments, and indeed there is no *evidence* to show there was default on any subsequent payment or that Del Duca ever took or threatened to take any steps by way of foreclosure or otherwise to enforce payment of same.

the promise cannot be enforced until the fund is realized, unless the failure to realize or collect the fund from which payment is made, is due to the neglect, or the unreasonable refusal to act, of the promisor, or is otherwise attributable to him. So, where the contract of the parties is that the creditor shall look to a particular fund, he cannot, on the failure of such fund not attributable to the fault of the debtor, hold the debtor personally responsible. . . .' ''

The ''real question involved is whether the breach is total and whether damages, as for a total breach, are recoverable'' (17 Am.Jur.2d, § 448, p. 911). The ''refusal to perform [through preventing creation of the fund] must be of the whole contract or of a promise or obligation going to the whole consideration, and it must be distinct, unequivocal, and absolute'' (*id.* § 450, p. 914). Volume 5 Williston on Contracts, (rev. ed.) section 1328, page 3735: ''An anticipatory breach can hardly be greater than an actual one, and if an actual breach of such a contract is partial, an anticipatory breach should not be more.''

There is inherent in every contract an '' 'implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.' (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 771 [128 P.2d 665].)'' (*Calabrese* v. *Rexall Drug & Chemical Co.*, 218 Cal.App.2d 774, 782 [32 Cal.Rptr. 665].) In this instance, Lamarr expressly assumed such an obligation, as shown by the quotation from paragraph 4 of the settlement agreement, *supra.* Appellants rely upon alleged wilful failure to perform acts which obviously would tend to facilitate the creation of the fund from which the $15,500 was to be paid. The trial court found against this contention of appellant, and rightly.

The editing of the pictures plainly was for Miss Lamarr. She testified without any contradiction: ''I edited for a solid year this picture'' beginning around 1957 and ''not yet'' ended.

The release of the picture turned upon finding a distributor. Substantial evidence shows that considerable futile efforts were expended in this direction and that Del Duca was co-operative. Miss Lamarr herself attempted to obtain a distributor. Mr. Paul R. Rutan, assistant to the treasurer of Technicolor Corporation, testified his company had posses-

sion of the film under a pledgeholder's agreement and was subject to directions of Del Duca as to screening of same, etc.; that the film was received by Technicolor in the fall of 1955, sent to New York in January 1959, to Mr. Schwaber for exhibition to possible exhibitors; it was returned to Los Angeles in May 1960. Before the New York trip, it was screened several times at the instance of Lamarr, and this was also done after its return. As late as 1961, Technicolor was advised that Del Duca was willing for plaintiff Harper to have a screening for his client, Mr. Casanave, whom he was trying to interest in distributing. The picture was also screened for Bernice Block at Miss Lamarr's request and she accompanied the district manager of Paramount to a showing of "The Love of Three Queens."

William E. Stein, vice president and treasurer of Lamarr Productions, Inc. and Donau, Inc., was called as a defense witness "to show to the court what extensive efforts were made to distribute the film," etc. He sought offers from Howco Films, Cinerama Corporation, Barnett Shapiro, an attorney interested in such matters, and Sid Pink. It was admitted by all that there never was any distribution. As a result of objections which the judge interposed to proffered evidence, the following stipulation was made: "MR. INMAN: My proof will be from the date of its completion as an answer print, July 1958, until the present time, the day of this hearing, that continuously throughout this period extensive attempts were made to distribute this picture or to sell it. THE COURT: Without success? MR. INMAN: Without success. THE COURT: Will counsel stipulate that that would be the testimony? MR. GOODMAN: I would, your Honor. THE COURT: All right."

The witness Stein related efforts of his own to find a distributor: "A. I contacted everyone that I knew that would view the film with the possibility of distributing or releasing the film through their company. I also contacted persons that Miss Lamarr knew and I certainly to the best of my ability attempted to reach as many people in the industry that would be interested in this type of film as I could. I talked with people that were far more expert than I and took their suggestions and attempted to effect the distribution of the film. Q. Did you as a result of any of these contacts ever show the film to any of these people? A. Yes. The film was shown on many occasions."

The witness and Miss LaMarr also tried to effect an out-

right sale of the picture as a distressed film, but without success. Efforts to sell to television interests met the same fate.

During the Stein examination the court intervened and the following colloquy occurred: THE COURT: Is there any reason why we shouldn't bluntly conclude from the evidence that the picture was, as commonly called, a flop? MR. INMAN: I would indicate that is what the evidence shows, your Honor. THE COURT: Well, the effect of your evidence, you are going to argue the picture is a flop?... MR. INMAN: The effect of this evidence is to show that it was impossible to move in any fashion, in every attempt that was made. Miss Lamarr might think its value other than the economic hard facts might indicate, but subject to that limitation, yes, that is the purpose of our evidence.''

The court's formal finding says: ''Said picture was substantially completed, edited and ready for distribution by August 1958. From time to time minor editing, adapting, cutting and dubbing was done in an effort to secure distribution. The failure of the picture to enter the market or be distributed on any terms was due solely and entirely to its lack of artistic merit and box office appeal. The picture was mechanically ready for distribution, but it was, in the parlance of the trade, a complete 'flop', and failed to evoke interest, much less earn any money.'' The evidence certainly does not establish without substantial conflict, as would be essential to a reversal, any intentional default of defendants upon their obligation to protect Lamarr's rights and thus facilitate the creation of the special fund to which plaintiffs had agreed to look for their $15,500 balance.

Appellants point to the Lamarr agreement, in paragraph 4, to comply with all the terms of the series of agreements between Lamarr and Del Duca, including the chattel mortgage. They emphasize the failure of Lamarr to pay to Del Duca the $5,000 due on January 29, 1959. In considering this contention it is important to keep in mind the fact that we are discussing a default in payment of money due from Lamarr to Del Duca and the further fact that appellants seek to convert this into a proximate cause of nonbirth of the special fund to which appellants had to look.

Confessedly, this fund must grow out of payments due and made to Lamarr on account of some phase of production and exploitation of the motion picture, and those rights were conceded in the settlement agreement to be subordinate to

those of Del Duca's mortgage for $301,666. When Del Duca declared a default less than a month after the due date of the $5,000 payment, it merely threatened to "proceed to enforce its rights in the premises" under the mortgage and the Laboratory Pledgeholder's Agreement if the default were not cured by March 9, 1959. No foreclosure or other attempt to enforce Del Duca's rights followed at any time, and Lamarr's right to participate in the proceeds of any distribution (if one ever eventuates) still exists (so far as the record shows). It cannot be held that the failure to make the $5,000 payment was the proximate cause of failure of the special fund to come into being. How could full payment of monies owing from Lamarr to Del Duca produce a distributor? ▇ Proximate cause essentially is a question of fact (*Mosley* v. *Arden Farms Co.,* 26 Cal.2d 213, 219 [157 P.2d 372, 158 A.L.R. 872]). A mere possibility is not enough to establish that issue (*Trainor* v. *Maus,* 126 Cal.App.2d 295 [271 P.2d 957]). "When there is evidence that the injury may be reasonably attributed to a cause for which no liability attaches to defendant, it is proper to find against plaintiff on the issue of negligence." (*Hill* v. *Mathews Paint Co.,* 149 Cal.App.2d 714, 723 [308 P.2d 865].)

The special fund, under the agreement, must consist of monies payable to Lamarr from the picture, not of monies payable by her. Only if it be shown by evidence that Lamarr failed to make all payments and that that resulted in foreclosure by Del Duca of all Lamarr's rights could it be held that Lamarr's defaults had resulted proximately in defeating her right to participate in the earnings of the picture, assuming a distributor could be found. In this connection it is not shown, and it makes no difference, whether the nonpayment was a deliberate breach or even a fraudulent one for there is no issue of fraud in the case.

Appellants' attack upon the judgment takes the form of contention that certain specific findings are not supported by the evidence. To some extent, this is true of paragraphs V and VI of the findings and paragraph III of the conclusions of law.

Paragraph V of the findings is modified to read as follows: "Said picture was substantially completed, edited and ready for distribution by August 1958. From time to time editing, adapting, cutting and dubbing was done in an effort to secure distribution. The failure of the picture to enter the market or be distributed on any terms was due to its lack of box

office appeal. The picture was mechanically ready for distribution, but it failed to evoke interest, much less earn any money. Both Lamarr and Technicolor screened the film repeatedly in an effort to interest exhibitors.''

Paragraph VI is modified by striking the word ''monthly'' therefrom.

Conclusion of law number III is modified to read: ''Neither all nor any of the defendants did anything which defeated in any way or degree the payment of said proceeds or funds to plaintiffs or plaintiffs' assignors.''

The findings are supported by substantial evidence in other respects and require no discussion.

The findings and conclusions of law having been modified as aforesaid, the judgment is affirmed.

Shinn, P. J., and Kaus, J., concurred.

A petition for a rehearing was denied June 14, 1965, and appellant's petition for a hearing by the Supreme Court was denied July 14, 1965.