[No. F011066. Fifth Dist. Aug. 26, 1991.]

SUNNILAND FRUIT, INC., Plaintiff, Cross-defendant and Appellant, v. SAVERIO VERNI, Defendant, Cross-complainant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, IV and V.

894

COUNSEL

Burger & Flaherty, Peter H. Mixon and Ralf Christe for Plaintiff, Cross-defendant and Appellant.

Chinello, Chinello, Shelton & Auchard, Andrew B. Jones and Daniel I. Aller III for Defendant, Cross-complainant and Appellant.

## OPINION

**THAXTER, J.**—After a nonjury trial the court below entered judgment denying all relief on the complaint filed by plaintiff/appellant Sunniland Fruit, Inc., and on the cross-complaint filed by defendant/appellant Saverio Verni. The action arose from a dispute involving Sunniland's picking, packing, and marketing of Verni's 1985 table grape crop under a written contract between the parties. Sunniland's complaint alleged breach of contract, a common count, and a claim on an account stated and sought recovery of $169,337.40 consisting of a crop advance of $150,000 and an additional $19,337.40 in fees and charges incurred on behalf of Verni but not recovered through the sale of the grapes. Verni's cross-complaint alleged breach of contract and fraud.

We will agree with Sunniland that the trial court erroneously interpreted the contract as not requiring repayment of the $150,000 advance because of insufficient crop proceeds. We will reverse and remand with directions to correct that error and to determine if Verni is entitled to any offsets against the $150,000 advance. We will also remand for further proceedings on the issue of attorneys fees. In other respects we will affirm the judgment.

### FACTS

Sunniland, as a licensed commission merchant/broker (see Food & Agr. Code, § 56101 et seq.), is in the business of packing, storing, and marketing various types of fresh fruit, including table grapes. Verni is a grape farmer. In the spring of 1985, Verni negotiated a written contract with Sunniland, under the terms of which Sunniland was to harvest, field-pack, and market Verni's table grapes.

Sunniland was to pick only USDA No. 1 grapes and to use its best efforts to market the grapes at a profitable rate. In return for its services, Sunniland was to receive a commission on all grapes sold and a per lug harvesting/packing charge. A limited number of other charges were authorized under the contract. Verni was responsible for the cultural practices needed to bring the crop to harvest.

The contract identified three possible ways of marketing the grapes: f.o.b. (freight on board), a delivered sale, and reconsignment. The best return is

likely if the grapes are sold f.o.b. The least advantageous return is likely when grapes are sold by reconsignment because a second commission merchant subtracts his or her costs (including a second commission) from the sale in addition to those subtracted by the original broker. A product is reconsigned only when the broker is unable to sell the product f.o.b. or delivered sale.

Addendum 2 to the contract provided for a $150,000 advance to Verni for "preharvest expenses." Sunniland contends the money was an interest-free loan. Verni contends it was a minimum recovery guarantee and that Sunniland "purchased" his 1985 grape harvest for a minimum of $150,000.

Sunniland drafted the contract between the parties. The contract does not expressly address what would happen if no profit were realized from the 1985 crop. Verni and Sunniland President Mike Colavita agree they did not discuss the meaning of addendum 2 or how it related to the other provisions of the contract. Verni did not expressly agree to return the advance if no profit was realized. Colavita did not agree to "purchase" Verni's crop. He expected Verni to repay the advance if insufficient profit was generated. Both parties anticipated sufficient profit to cover the advance and the costs of marketing.

Unfortunately, the 1985 table grape market was glutted and the general quality of grapes was down. It was difficult, if not impossible, for farmers to make a profit irrespective of the quality of their grapes. The f.o.b. market was very tight. Only "first label" grapes could be sold f.o.b. Most of Verni's grapes, although meeting USDA No. 1 grade, were of "second label" quality.

Though Sunniland claims it made its best effort to sell the Verni crop, it was unable to do so on favorable terms. The grapes sat for long periods of time in cold storage, generating additional storage charges provided for in the contract. When buyers were located, the prices obtained did not cover the costs already incurred for harvesting, packing, shipping, storage, and commission. Nearly 60 percent of the sales made were reconsignments. Some of the varieties sold better later in the season, but no profit was realized. The costs of marketing the grapes, plus Sunniland's commission, exceeded the income generated from sales by $19,337.40.

Verni was unaware of the problems Sunniland faced. Contrary to industry standards, there was little communication between Sunniland and Verni concerning the sales of his grapes during the marketing season. Verni learned of the difficulties in early October or November 1985. At that point most of

the grapes harvested remained in cold storage or had been sold at prices insufficient to cover costs or generate a profit.

At the end of the season, Sunniland submitted a full accounting to Verni claiming Verni not only had to repay the $150,000 "advance" but also pay the additional $19,337.40 because marketing costs exceeded sales income by this amount. Simply put, Verni's account was some $19,000 in the red.

Understandably, Verni was not pleased with this result and filed a complaint with the California Department of Food and Agricultural Marketing Enforcement Branch (Department). The Department conducted an investigation and found numerous violations of the relevant regulations, mostly the result of insufficient recordkeeping. The Department also concluded Sunniland had not used its best efforts to market Verni's grapes, citing the delays in marketing and the high rate of reconsigned sales. It did not, however, identify buyers willing to purchase the grapes at higher prices and/or under more favorable terms. The Department's examination report was received in evidence. The report concluded that Sunniland overcharged Verni $95,434.97 and reflected that amount as an offset against Sunniland's total claim. Because the Department concluded that Verni still owed Sunniland $73,902.43, it took no further action on Verni's complaint.

## DISCUSSION

### I. The Trial Court Incorrectly Interpreted the Agreement as to the $150,000 Advance.

The key issue raised by the complaint is the interpretation of addendum 2 to the written agreement. Sunniland contends the advance was a loan to be repaid at the time of the final accounting once it was established Verni would realize no return on his crop. Verni states the advance was a minimum recovery guarantee, not a loan. Even if the advance is a loan, Verni argues repayment was required under the contract only if there were funds due him at the end of the season.

Sunniland maintains we must construe the contract de novo. Verni argues the trial court made findings of fact from contradictory evidence and therefore we must review under a sufficiency of the evidence standard. Sunniland challenges the use of parol evidence by the trial court.

The language of addendum 2 is:

"Shipper will advance Grower $150,000.00 for preharvest expenses. A $50,000.00 advance will be made by June 15th and the additional sum will

be advanced by July 15th. The advance totaling $150,000 will be considered an interest free loan and will be deducted from the funds due the Grower."

■ The interpretation of a written instrument is a judicial function to be exercised according to the generally accepted canons of interpretation, unless the interpretation turns upon the credibility of extrinsic evidence. When the interpretation turns on a credibility determination, interpretation becomes a question of fact. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) When the contract is unambiguous, an appellate court is not bound by the trial court's interpretation of the contract. (*Ibid.*; see also *Los Banos Gravel Co.* v. *Freeman* (1976) 58 Cal.App.3d 785, 791-792 [130 Cal.Rptr. 180].) However, when the meaning of a contract is uncertain, and contradictory evidence is introduced to aid in the interpretation, the question of meaning is one of fact properly assigned to the fact finder and its findings should not be disturbed by the appellate tribunal. (*Loree* v. *Robert F. Driver Co.* (1978) 87 Cal.App.3d 1032, 1039-1040 [151 Cal.Rptr. 557].)

■ The extrinsic evidence Verni relies on to support his interpretation of addendum 2 is his own testimony that he understood the $150,000 to be a minimum recovery. He argues the trial court obviously accepted this testimony as true and therefore we are bound by that finding. However, irrespective of any credibility determination, Verni's subjective intent or understanding cannot be used to establish an intent independent from the express written terms of the agreement.

■ Under the parol evidence rule, extrinsic evidence is not admissible to contradict express terms in a written contract or to explain what the agreement was. (*BMW of North America, Inc.* v. *New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980, 990 [209 Cal.Rptr. 50].) The agreement is the writing itself. (*Ibid.*) Parol evidence may be admitted to explain the meaning of a writing when the meaning urged is one to which the written contract term is reasonably susceptible or when the contract is ambiguous. (*Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *BMW of North America, Inc.* v. *New Motor Vehicle Bd., supra,* 162 Cal.App.3d at p. 990, fn. 4.) Parol evidence cannot, however, be admitted to show intention independent of an unambiguous written instrument. (*Sass* v. *Hank* (1951) 108 Cal.App.2d 207, 214 [238 P.2d 652].)

■ The language of addendum 2 unequivocally establishes the $150,000 was a loan and not a minimum recovery guarantee or purchase price. The language could not be more clear. The expressed intention of the parties is that the "advance" was a loan to Verni for preharvest expenses. The

loan was to be repaid after a final accounting on the 1985 grape crop, regardless of the bottom line of the 1985 season.

The extrinsic evidence presented at trial was not offered to explain the meaning of a written term and thus does not fall within the recognized exception to the parol evidence rule. For example, there was no evidence that the words "advance" or "loan" are commonly used in the fruit marketing business to mean something other than the meaning generally attributed to them. There was no evidence the parties mutually agreed the words were to mean something other than what they normally mean. Nor is there any evidence of a mutual agreement to characterize the "advance" as anything other than a loan. The parties testified the language of addendum 2 was not discussed.

The words "advance" and "loan" generally connote an agreement to reimburse the one providing the funds. (*Rochester Capital Leasing Corp.* v. *K & L Litho Corp.* (1970) 13 Cal.App.3d 697, 702 [91 Cal.Rptr. 827]; *Golden State Lanes* v. *Fox* (1965) 232 Cal.App.2d 135, 139 [42 Cal.Rptr. 568]; *Haseltine* v. *Haseltine* (1962) 203 Cal.App.2d 48, 52 [21 Cal.Rptr. 238].) In the absence of evidence to the contrary, these words must be given their ordinary meaning. (Civ. Code, § 1644.) The language of addendum 2 clearly anticipates repayment—the $150,000 was a loan in the true sense of the word. The language is simply not reasonably susceptible to the meaning given to it by the trial court.

 Having established the nature of the advance, we next consider whether repayment was conditioned on there being a profit at the end of the season. A party to a contract may limit an obligation to pay monies due out of a specific fund or source. (*Martin* v. *Martin* (1935) 5 Cal.App.2d 591, 593 [43 P.2d 314].) In several cases appellate courts have found the parties agreed to limit payment of debt, fees for services rendered, or commissions due to a specified fund. In such cases, there is no obligation to pay if the fund does not materialize because existence of the fund is a condition precedent to repayment. (See *id.* at pp. 592-593; *Parsons* v. *Bristol Development Co.*, *supra*, 62 Cal.2d at p. 868; *Jeschke* v. *Lamarr* (1965) 234 Cal.App.2d 506, 511 [44 Cal.Rptr. 416]; *Cullen* v. *Powers* (1962) 209 Cal.App.2d 592, 595-596 [26 Cal.Rptr. 467]; *Draper* v. *Patterson* (1958) 156 Cal.App.2d 606, 608-609 [319 P.2d 694]; *Carpenter* v. *Elmer R. Sly Co.* (1930) 109 Cal.App. 539, 547 [293 P. 162].) However, these cases are distinguishable. Admittedly, in some of these decisions, a comparison of the language of the contract addressing repayment and the language of addendum 2 in our case may reveal only a subtle difference. However, in these cases there is additional independent evidence of an agreement not to require payment unless the conditioned fund materialized.

In *Parsons*, the contract contained a related provision stating payment was to be made only from the construction loan funds realized by the parties. The court concluded the parties intended the existence of a fund to be a prerequisite for payment. Similarly in *Carpenter*, a separate provision of the contract stated the obligation was "enforceable only against and is payable out of" the identified fund. *Cullen* involved an oral agreement to run a fund-raising and reelection campaign. The court found the agreement was that the costs plus the fee would only come out of the money raised and concluded the candidate was not personally liable for the excess costs.

In *Martin*, a son received advances on his inheritance prior to his mother's death. When his mother died, he agreed to offset his "advance" against his claim on the estate. Since his immediate share of the estate did not cover what he had received during his mother's life, he agreed the excess would be offset against his share of the income and proceeds from real property in the estate. Later the mother's estate sought to recover from the son's estate the amount not offset. The court concluded the son did not agree to repay absolutely what he had received during his mother's life. He only agreed to offset the amount from his share of the real estate income. In *Jeschke* and *Draper* the court looked at the nature of the services rendered and the negotiations of the parties and concluded payment was restricted to the profits generated under the contract.

In contrast, addendum 2 to the agreement here states only that the loan will be "deducted" from the funds due the grower. There is no evidence of an agreement to limit the source of repayment. When the money claimed is an identifiable debt and there is no evidence establishing that the party advancing the moneys assumed the risk inherent in the venture, identification of a particular pool of money as a source of payment does not limit or preclude recovery from other sources when the pool fails to materialize *unless* the agreement expressly so states. (See 3A Corbin, Contracts (1960) § 636, p. 43; see also *Nikolaus* v. *Howe* (1954) 122 Cal.App.2d 422 [265 P.2d 99]; *Belmont* v. *Milton* (1941) 43 Cal.App.2d 120, 121-125 [110 P.2d 525].)

We know of no California cases addressing this issue in the context of marketing crops. Sunniland cites an early Oregon case, *Pinnacle Packing Co.* v. *Herbert* (1934) 157 Ore. 96 [70 P.2d 31, 111 A.L.R. 1055] involving a similar marketing situation which we find persuasive. Mrs. Herbert owned an orchard. She and her lessee, in an attempt to raise financing for the 1934 growing season, arranged a financing package with the bank and the packer. From the packer, she was to receive an "advance" on her expected profits for 1934 as needed for cultural practices and harvesting. At the end of the season, the amount of the "advance" exceeded the sales income on the crop

less packing and shipping charges. Mrs. Herbert refused to repay the advance, saying the packer was only able to seek repayment from crop sales and could not collect from Mrs. Herbert personally. The court rejected the argument and concluded under the written terms of the agreement the "advance" was clearly a loan creating an obligation of repayment. In the absence of a provision within the written agreement or evidence in the record of an agreement to limit repayment to the proceeds of sale, the packer could seek repayment from Mrs. Herbert. (*Id.* at pp. 35-36.)

A second Oregon decision, also soundly reasoned, provides additional guidance in this case. In *Killam* v. *Tenney* (1961) 229 Ore. 134 [366 P.2d 739], the plaintiff brought an action to recover an unpaid real estate broker's commission. The contract expressly promised the seller would pay a broker's fee of $20,000. A later provision provided the broker was entitled to receive his commission from a deposit or part payment made by the purchaser. The seller argued the commission was limited to this source. The court rejected the argument stating:

"The agreement here is not one to pay a fee out of moneys paid or deposited on the purchase price, but to pay $20,000 for the services rendered regardless of the source of the money. The provision on which the defendant depends, instead of being a limitation on this promise, is a reservation of the right to be paid out of a deposit or payment on the purchase price, which is additional to the promise first expressed and not a limitation of it." (366 P.2d at p. 746.)

The two Oregon cases are analogous to the case at hand. The language of addendum 2 clearly creates an obligation to repay the loan. There is no provision in the contract or any other evidence (despite the trial court's finding to the contrary) to support a conclusion that Sunniland assumed the risk that the 1985 grape market would not produce a return for Verni or otherwise limited its right to repayment on the loan. Therefore, Verni remains liable for repayment, less any offset.

Our conclusion is consistent with a reading of the agreement as a whole. (Civ. Code, § 1641.) Section 12[1] (although not applicable to the harm caused

---

[1]Section 12 of the agreement provides: "Neither party to this Agreement shall be required to perform, or be liable for failure to perform, if non-performance is caused by strikes, work stoppages, or labor demands or difficulties; labor shortages or inability to procure labor, shortages of equipment, materials, or supplies, shortages or lack of cooling or processing facilities, water shortages, car or truck shortages, transportation difficulties, war, hostilities, or national emergencies, acts of God, the elements, mechanical breakdowns; power failures; or causes beyond the control of the party unable to perform, save and except that if any funds

by a poor market) implies advances are to be repaid even when there is no return on the crop. Section 7B,[2] which provides there is no guarantee of market prices, implies a recognition that the market is unpredictable. Both sections impliedly express an intent that the risk of the market remains with the grower.

Therefore, we hold as a matter of law addendum 2 must be interpreted as a loan to Verni for preharvest expenses and as authorizing Sunniland to offset the advance against any money due Verni at the season's end. In other words, the advance was to be repaid at the time of the 1985 final accounting between Verni and Sunniland. (See 3A Corbin, Contracts, *op. cit. supra*, p. 43.)

To the extent the judgment below was based on the court's interpretation that the parties' contract did not require repayment of the advance in the absence of net crop proceeds due Verni, it is erroneous and must be reversed.

## II.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment on the complaint is reversed and remanded with instructions to enter judgment in favor of Sunniland and against Verni in the amount of $150,000, less any offsets to which the trial court may determine Verni is entitled, plus interest at the legal rate from the date of Sunniland's final accounting, which date the trial court shall determine on remand. After determination of all remaining issues on the complaint, the trial court shall determine entitlement to attorneys fees. In all other respects, the judgment is affirmed. Costs on appeal are awarded to Sunniland.

Best, P. J., and Bianchi, J.,[†]

---

have been loaned by Shipper to Grower, the amount loaned plus interest shall be due and payable on demand by Shipper."

[2]Section 7B of the agreement provides: "Shipper will attempt to obtain the best market prices, but in no event shall this instrument be held or construed as a guarantee of any specific price."

*See footnote, *ante*, page 892.

[†]Retired judge of the Kern Superior Court sitting under assignment by the Chairperson of the Judicial Council. concurred.